591 F.2d 1069
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jack Earl BARRENTINE, Pauline Crenshaw, Lillie Belle Griggs,
Bobby Joe Lee, Olin Whitaker, Jr., a/k/a "Sugar Boy,"
Lucille Clark, Barbara Singleton Smith, Dean Rene Peters,
Walter Richard Smith, Jr., a/k/a Bobby Smith, Dora Thomas,
Defendants-Appellants.
 No. 77-5763.
 United States Court of Appeals,
Fifth Circuit.
 March 22, 1979.
 
 Michael E. Garner, Columbus, Ga. (Court-appointed), Clark retained for Peters (Court-appointed for Barrentine, Clark, Crenshaw, Griggs, Lee & Whitaker only).
 John A. Nuckolls, Atlanta, Ga., for Barbara Singleton Smith, and Walter Richard Smith.
 Barry E. Teague, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.
 Appeals from the United States District Court For the Middle District of Alabama.
 Before MORGAN, RONEY and VANCE, Circuit Judges.
 VANCE, Circuit Judge.
 
 
 1
 Eighteen individuals[1] were indicted on three counts in the Middle District of Alabama on September 27, 1977. The first count charged a conspiracy under 18 U.S.C. § 371. It alleged that defendants conspired to transport gambling paraphernalia in interstate commerce in violation of 18 U.S.C. § 1953 and to conduct an illegal gambling business in violation of 18 U.S.C. § 1955. The second count charged defendants with operating an illegal gambling business in violation of 18 U.S.C. § 1955. Count three charged defendants with transporting gambling paraphernalia in interstate commerce in violation of 18 U.S.C. § 1953. Their trial commenced on October 31, 1977, and concluded on November 9, 1977. The jury returned the following verdicts: Walter Smith (also known as Bobby Smith), guilty of counts one, two, and three; Barbara Smith, guilty of counts one and two; Bobby Joe Lee, guilty of counts one, two, and three; Jack Earl Barrentine, guilty of counts one, two, and three; Dean Rene Peters, guilty of counts one, two and three; Lillie Belle Griggs, guilty of counts one and two; Pauline Crenshaw, guilty of counts one and two; Olin Whitaker, Jr., guilty of counts one and two; Lucille Clark, guilty of counts one and two; and Dora Thomas, guilty of counts one and two.[2] The defendants received varying sentences ranging from five years probation to four years imprisonment. In the case of each defendant the court ordered that sentences to imprisonment under multiple counts should run concurrently. In addition Walter Smith was fined $10,000 on each of the three counts for a total of $30,000. The ten defendants listed above filed notices of appeal on November 17, 1977.
 
 
 2
 Walter and Barbara Smith present nine claims of error. Barrentine, Lee, Peters, Griggs, Crenshaw, Whitaker, and Clark present only three of the nine claims of error.[3] We have considered all nine claims and conclude that the appellants' convictions must be affirmed. We will discuss only those claims that present substantial questions.
 
 
 3
 * Appellants, Barbara and Bobby Smith, complain that the trial court erred in failing to grant a continuance so that retained counsel of their choice could be present during trial.[4] They claim that this error violated their sixth amendment rights.[5] The United States maintains that the trial court did not abuse its discretion, particularly in view of the trial judge's warning to the Smiths that he would not continue the trial to resolve a conflict in the schedule of their newly retained counsel, Edward T. M. Garland, Esq.
 
 
 4
 The Smiths first became aware of the pending investigation and the likelihood of an indictment against them on June 16, 1977, when the government conducted a raid by executing several search warrants in Phenix City, Alabama, and Columbus, Georgia. One of the search warrants was executed by a search of the Smiths' residence. Almost immediately Bobby Smith engaged his usual attorney, Frank K. Martin, Esq., to represent him.
 
 
 5
 During the month of July 1977 Mr. Martin had a conversation with the United States Attorney regarding Bobby Smith and a possible deal, which would avoid his indictment. Mr. Martin was advised before the grand jury met, however, that there would be no plea bargain and that the United States would seek an indictment.
 
 
 6
 On September 27, 1977, the appellants were indicted. The Smiths were informed of the indictment on September 29. They appeared initially on October 3, 1977, before a United States magistrate and were released on bond. On Mr. Martin's recommendation the Smiths retained Garland on October 1, 1977. Garland appeared on behalf of the Smiths at the arraignment on October 7, 1977.
 
 
 7
 On October 12, 1977, the Smiths and Garland were notified that trial was set for October 31, 1977. By that time both Garland and the Smiths were aware that the trial might conflict with another trial on Garland's schedule. On the same day Garland, together with the Smiths, prepared a motion for continuance and attached the affidavit of Bobby Smith requesting that only Garland represent him. This motion was filed on October 14, 1977, but was denied on October 18, 1977. On that day the court also ordered that other pending motions be heard on October 20, 1977.[6]
 
 
 8
 During this oral hearing Garland renewed his motion for continuance, and, in the presence of the Smiths, the following colloquy between the court and Garland occurred:
 
 
 9
 MR. GARLAND: . . . Your Honor knows of my third ground which is the potential conflict, although the government's case over there is cracking a little bit and I may very well finish that in time to be present.
 
 
 10
 THE COURT: I would hope so. You make arrangements to have someone here if you can't be here.
 
 
 11
 MR. GARLAND: Your Honor, my client won't accept that.
 
 
 12
 THE COURT: Well, I can't let your clients run my office and my calendar by selection of an attorney who is too busy to accept his case. Now, when you accept a case in my court you have a responsibility to my court to be here.
 
 
 13
 MR. GARLAND: Yes, sir, and we have a conflict in rights there I believe.
 
 
 14
 THE COURT: Well, you can decide your own conflicts, I am not going to decide it. But I will decide that your client can't have a conflict in his attorney's rights which will delay the action of this court.
 
 
 15
 MR. GARLAND: I understand, Your Honor. I am advising the client of his rights in that respect and I don't want that issue hadn't been I don't want to draw blood on that issue at this point.
 
 
 16
 THE COURT: Well, we will be ready to draw it whenever you are ready.
 
 
 17
 MR. GARLAND: Yes, Sir, it just doesn't seem like it is necessary yet.
 
 
 18
 The court and Garland discussed the situation again at the end of the hearing.
 
 
 19
 MR. GARLAND: Your Honor, speaking of again Monday, October 31. Would Your Honor consider beginning Nov. 7?
 
 
 20
 THE COURT: No, sir, my calendar is loaded. I couldn't fit this case in.
 
 
 21
 MR. GARLAND: . . . I, as you know, have a problem. The case I am in I think is going to end about Tuesday, November the 1st, and I want to be here and I want to try this case, but with Your Honor going out of town, that's a problem; there isn't one case that can be slipped around to October 31 and let this one start November 7? I think I will be through.
 
 
 22
 THE COURT: There isn't because I am starting another docket in a different place, as I recall it, on the 7th.
 
 
 23
 We particularly note that the Smiths were present throughout these discussions and must have been fully aware of the court's position.
 
 
 24
 Apparently the Smiths did nothing to remedy their situation between October 20 and October 31, 1977, in spite of the court's clear statement of its position. On October 31, 1977, John A. Nuckolls, Esq., a member of Garland's firm, was present.[7] He advised the court that Garland was engaged in another trial and would not be available for the Smiths' trial.
 
 
 25
 As a result of this predicament the following discussion took place on October 31, 1977, the morning of the trial:
 
 
 26
 THE COURT: All right. Well, I told Mr. Garland when he was here last that it is the practice of this court that attorneys should not except (sic) retainers to practice in this court unless they plan to abide by the settings that this court makes, and Mr. Garland had an opportunity to do that. He was told that, he knew of my practice, and he is not here, and I am appointing you to represent Mr. and Mrs. Smith and we will go to trial unless the United States attorney has another suggestion.
 
 
 27
 MR. SMITH: Your Honor, may I address the Court, please?
 
 
 28
 THE COURT: Yes, sir.
 
 
 29
 MR. SMITH: Mr. Nuckolls, I do not even know him. I met him once before this morning. He is not familiar with my case. I have already retained Mr. Garland and it is my contention that the government says I am the one out of the whole bunch of conspiracy that they want the most; that was the reason I went to Mr. Garland, on referral from other attorneys. He has been well paid, I am sorry he is not here. I have no intention to try to delay this trial.
 
 
 30
 THE COURT: Mr. Smith, I am doing all of the criminal work for the Middle District of Alabama now. I cannot have lawyers set the terms of my court to suit themselves. I explained that to Mr. Garland, he accepted your money, he accepted your case on that basis, and for him to come in on the day of the trial when we have put everything else off to take care of your trial, is inexcusable, and the case will not be continued, we will go to trial. If Mr. Garland gets here he can participate, if he can't Mr. Nuckolls will represent you. You are entitled to a lawyer. You are entitled to have Mr. Garland acquaint his partner, or whomever may sit for him, with your case, but you are not entitled to continue the case simply because Mr. Garland gets himself so involved that he can't be in this court.
 
 
 31
 MR. SMITH: Yes, thank you.
 
 
 32
 The disposition of motions for continuance is vested in the sound discretion of the trial court. Its ruling will not be disturbed on appeal, except upon a clear showing of abuse of its discretion. Avery v. Alabama,308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); United States v. Uptain,531 F.2d 1281 (5th Cir. 1976). Whether an abuse of discretion has occurred will be decided on a "case by case basis in light of the circumstances presented." Id. at 1285. In reaching a decision we examine the reasons for the continuance given at the time the request was denied. Ungar v. Sarafite,376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); McKinney v. Wainwright,488 F.2d 28 (5th Cir.), Cert. denied, 416 U.S. 973, 94 S.Ct. 1998, 40 L.Ed.2d 562 (1974).
 
 
 33
 Several additional facts are pertinent to our consideration of the trial judge's exercise of discretion. In this case there were eighteen defendants, sixteen of whom were ready to proceed when the continuance was requested. The forty-seven witnesses used by the government had been subpoenaed and were then in court or were available to testify. Garland and Nuckolls are partners in a twelve-member, well-regarded Atlanta law firm that routinely handles criminal cases. They are of about the same age and experience. Smith is an experienced defendant who has had a long and close professional relationship with his regular attorney, Martin. Mrs. Smith has worked in the past as a receptionist in Martin's law office. The Smiths chose Garland because he was recommended by Martin. Martin represented Smith in the firearms case that also arose out of the June raid and is now pending in this court. There were few, if any, conflicts in the interests of the defendants. Attorneys for the other defendants were prepared and vigorously attacked the government's case.
 
 
 34
 One aspect of the right to counsel enveloped in the due process clause is "the right to a reasonable opportunity to select and be represented by chosen counsel." Gandy v. Alabama, 569 F.2d 1318, 1323 (5th Cir. 1978). It is also clear, however, that "the right to counsel of one's choice is not absolute as is the right to the assistance of counsel." Id. at 1323.
 
 
 35
 The Smiths rely strongly on Gandy v. Alabama, supra, and that case would, indeed, support their argument but for a significant number of distinguishing facts. On the day set for trial, Gandy's retained counsel suddenly and abruptly abandoned him to handle a civil case in another county. The state trial judge then denied Gandy a continuance and required the retained counsel's totally unprepared partner to defend Gandy. The Gandy court stated,
 
 
 36
 This is not a case in which the defendant was afforded an ample opportunity to secure counsel of his choice and attempted to manipulate the court's schedule by . . . selection of an unavailable attorney.
 
 
 37
 Gandy v. Alabama, supra, at 1328.
 
 
 38
 The case before us is markedly different. The trial court was faced with the extremely difficult task of managing a case with eighteen defendants and half-a-hundred witnesses. The Smiths were aware of the likelihood of their prosecution four and one-half months before trial. They knew of the conflict in Garland's schedule less than two weeks after they retained him. The manner in which Garland handled their case was inexcusably unprofessional, but the Smiths are far from innocent in the matter. They were informed of the court's refusal of a continuance by its order of October 18, 1977. They were present on October 20, 1977, when the court unequivocally stated that the trial would go forward with or without Garland. Other qualified attorneys were then available to assume the Smiths' defense. The Smiths had no constitutional right to a new counsel of their choice who was unavailable, particularly in view of the problems inherent in a trial of this nature.
 
 
 39
 The record supports the inference that Garland and the Smiths made a calculated attempt to force a continuance notwithstanding their knowledge of the trial judge's strongly voiced contrary ruling. True to his calling, Smith gambled, but this time he lost.
 
 
 40
 Unless we conclude that the ruling of the district court was an unreasonable resolution of the various factors confronting it, we must uphold the lower court's ruling, even though it may be considered a harsh one. United States v. Carroll, 582 F.2d 942 (5th Cir. 1978). We have closely scrutinized the question. In light of our analysis of the critical events leading up to the motion, we find no abuse of discretion.
 
 II
 
 41
 Charles Michael Bland was a member of the conspiracy, but he had become a government informant and therefore was not indicted. In their motion for a bill of particulars defense counsel sought the names of all unindicted coconspirators. The court granted this request. The government responded that there were none. All appellants contend that because Bland was an unindicted coconspirator the trial court erred in allowing him to testify. In the alternative, appellants contend that the trial court erred by not granting a continuance to allow defense counsel time to prepare for Bland's cross-examination. Their motion for continuance on this ground was made after the court had denied appellants' motion to suppress Bland's testimony. As a related sub-issue appellants argue the Assistant United States Attorney's response to this inquiry constituted prosecutorial misconduct that was so prejudicial that a new trial is required.
 
 
 42
 In answer to these contentions and in justification of its conduct the government argues that Bland was not an unindicted coconspirator. It concedes that at one time he was a member of the conspiracy, but argues that he had effectively withdrawn from the conspiracy at the time of defendants' indictment. The United States relies on United States v. Borelli, 336 F.2d 376 (2nd Cir.), Cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1964), in which the second circuit recognized that a conspirator can withdraw from the conspiracy if he takes affirmative steps to do so, and that making a clean breast to the authorities is affirmative action that can constitute such a withdrawal. In addition the government claims that its disclosure of Bland's identity would probably have resulted in his murder prior to trial.
 
 
 43
 With respect to Bland's safety we think it sufficient to state that the United States could have followed any of several permissible courses of action. The course it elected to follow was not among them. Its other contention fails because the government has attempted to make a broad extrapolation of a principle designed for defensive use by a defendant-coconspirator. Its purpose is not the circumvention of discovery. More important, perhaps, the argument is simply wrong as applied here. The indictment in this case covered the period from the first day of February 1976 through June 16, 1977. Bland testified that he entered the conspiracy in 1975. He does not claim that he stopped working for the operation until January 1977, and he did not become an FBI informant until April 1977. The government cites no authority to support an argument that withdrawal from a conspiracy absolves a conspirator of all pre-withdrawal guilt or alters his status as a conspirator during the period which predated his withdrawal. Such a position is untenable. If the government is asking that we extend Borelli to this end, we decline the invitation.
 
 
 44
 Our rejection of the government's argument, however, does not mean that the case must be reversed as a matter of course. To make that determination we look to complete circumstances in more detail.
 
 
 45
 Appellants' motion for bill of particulars sought the following information:
 
 
 46
 (9)
 
 
 47
 Specify the names, addresses and telephone numbers of any un-indicted co-conspirators now known to the Government, but not named in the Indictment.
 
 
 48
 (28)
 
 
 49
 State whether any defendant or co-conspirator has furnished, or has agreed to furnish, information to law enforcement authorities with respect to the alleged conspiracy or any of the charges contained in the Indictment.
 
 
 50
 The following colloquy, which took place during the hearing on the motion, is the basis of appellants' claim of error:
 
 
 51
 THE COURT: Who he knows or expects to show had knowledge of the conspiracy. In other words, if they were conspirators under the legal definition of conspirators, as Mr. Segrest sees it, I will require them to give you the name. But if he doesn't know they were conspirators he doesn't have to give you the name.
 
 
 52
 MR. SEGREST: It says specify the names, addresses and telephone numbers of any unindicted co-conspirators. We don't have any.
 
 
 53
 . . . We decline to give any particulars in regard to Request 28; if it is an attempt to get additional witnesses' names, we decline for that reason also.
 
 
 54
 THE COURT: . . . I will order the government to give the names of known conspirators not listed.
 
 
 55
 At no time before the morning of trial were appellants informed that Bland would be a witness for the government. Appellants were notified shortly before trial, and they requested that Bland's testimony be suppressed. When their request was denied, appellants moved for a continuance in order to prepare for their cross-examination of Bland. The court delayed the beginning of the trial until 1:30 p. m. on the same day, but appellants' continuance motion was otherwise denied. Appellants challenge both rulings.
 
 
 56
 The granting of a bill of particulars is another of the rulings that is within the discretion of the trial judge. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927). Professor Wright has observed that "for practical purposes the trial court's exercise of discretion is almost invariably final." 1 C. Wright, Federal Practice and Procedure, § 130, at 296 (1969). See also Tillman v. United States, 406 F.2d 930, 939 (5th Cir.), Vacated on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).
 
 
 57
 A bill of particulars is a proper procedure for discovering the names of unindicted coconspirators who the government plans to use as witnesses. It is not uncommon for the trial judge to require the government to disclose their names when information is necessary in a defendant's preparation for trial. Will v. United States, 389 U.S. 90, 99, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967). The trial court's response to the government's clearly improper failure to comply with such a requirement poses the precise question that now confronts us.
 
 
 58
 The statement found in United States v. James, 495 F.2d 434 (5th Cir.), Cert. denied, 419 U.S. 899, 95 S.Ct. 181, 42 L.Ed.2d 144 (1974), reflects the position of this court:
 
 
 59
 Our distaste for the government's conduct does not, however, warrant a reversal of the case at bar. We have previously held that "an error in administering the discovery rules is not reversible absent a showing that the error was prejudicial to the substantial rights of the defendant."
 
 
 60
 Id. at 436 (footnote omitted). Our cases have consistently required prejudice to the substantial rights of the defendant before reversing for alleged errors in the administration of discovery. United States v. Scruggs, 583 F.2d 238, 242 (5th Cir. 1978). Our opinion in United States v. Opager, 589 F.2d 799 (5th Cir. 1979) does not emphasize the requirement of prejudice, but there, as the court found, prejudice was clear. The last two sentences in Opager reflect that it is in harmony with the rule stated above:
 
 
 61
 It does matter that the Court's orders are obeyed. Noncompliance coupled with substantial likelihood of injury visits on the government the consequence of this reversal.
 
 
 62
 Appellants attempted to make the required showing of specific prejudice. In the Smiths' reply brief they urge that Bursey v. Weatherford, 528 F.2d 483 (4th Cir. 1975) recognizes as prejudicial the denial of the opportunity
 
 
 63
 (1) to consider whether plea bargaining might be the best course, (2) to do a background check on (the witness) for purposes of cross-examination, and (3) to attempt to counter the devastating impact of eyewitness identification.
 
 
 64
 Id. at 487. We do not find that appellants brought to our attention that Bursey v. Weatherford, supra, has been reversed by the United States Supreme Court. In Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), the Court, speaking through Mr. Justice White, held,
 
 
 65
 It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case, and Brady did not create one; as the Court wrote recently, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded . . .." Wardius v. Oregon, 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82 (1973). Brady is not implicated here where the only claim is that the state should have revealed that it would present the eyewitness testimony of a particular agent against the defendant at trial.
 
 
 66
 In terms of the defendant's right to a fair trial, the situation is not changed materially by the additional element relied upon by the Court of Appeals, namely, that Weatherford not only concealed his identity but represented he would not be a witness for the prosecution, an assertion that proved to be inaccurate.The Court of Appeals suggested that Weatherford's continued duplicity lost Bursey the opportunity to plea bargain. But there is no constitutional right to plea bargain . . .. As for Bursey's claimed disability to counter Weatherford's "devastating" testimony, the disadvantage was no more than exists in any case where the Government presents very damaging evidence that was not anticipated.
 
 
 67
 Id. at 559-561, 97 S.Ct. at 845.
 
 
 68
 Appellants particularly complain that because they were surprised they did not have adequate time to prepare for cross-examination. Their argument has obvious weaknesses. It was obvious from the scope of the raid that the government probably had received a great deal of inside information. Counsel concedes that from the beginning appellants suspected that Bland was the government's informer. Bland had been a high-level participant in the operation, but his name was conspicuously absent from the list of the persons indicted.
 
 
 69
 Appellants' suspicion of Bland is clearly reflected in their motion for discovery and inspection under Fed.R.Crim.P. 16. They repeatedly inquired as to whether Bland and a James Vaughn would be witnesses for the government.[8] These inquiries demonstrated the movants' suspicion that the government might be protecting Bland and Vaughn and that these two would be government witnesses. The motion did not similarly single out any other potential witnesses by name. It is equally clear that the government was unwilling to disclose in advance of trial whether it would use Bland and that the trial court was not going to require it to do so. The ultimate question being asked was whether Bland would testify for the government. From the totality of discovery responses we may well infer that appellants' suspicions should have been reinforced rather than allayed.
 
 
 70
 After Bland's name as a government witness was given to appellants, but before trial began, the government disclosed to defense counsel the information it possessed relative to charges pending against Bland.[9] In addition, defense counsel was given the opportunity to investigate further, and the help of the Assistant United States Attorney was made available to him.
 
 
 71
 The transcript of Bland's cross-examination by four defense attorneys consists of forty pages. Their questioning was vigorous and extensive. They tested Bland's direct testimony for weaknesses, attempted to impeach him and attempted to show his bias. They specifically probed whether he had made any deals in connection with his testimony. If more could have been accomplished on cross-examination, it has not been suggested to us.
 
 
 72
 In a final effort to show specific prejudice appellants contend that they believed at the time of trial that a deal had been made between the government and Bland, but because their motion for continuance was denied, they did not have sufficient opportunity to investigate. Both the government and Bland unequivocally denied having made any deal or even having had any discussions on the subject. No contrary evidence was presented to the trial court by post trial motion. Counsel asserts that he now has discovered such evidence which is submitted as an appendix to appellants' brief. He refers to a telegram and three pieces of correspondence, which apparently demonstrate that in February 1978, three months after trial, the State of Texas withdrew its request that Bland be extradited from the State of Georgia.
 
 
 73
 Without deciding whether these materials are properly before us we observe that they demonstrate the weakness rather than the strength of appellants' contention. First, the action that these papers reflect could scarcely have been discovered even had the requested continuance been granted. It had not been taken at that time. Second, the papers present information that is neither new nor meaningful. The prosecutor disclosed before trial that according to his information local authorities in Georgia had intervened with Texas authorities. The suggested line of cross-examination was pursued, but was nonproductive. Whether we consider this new information or not, we are left with nothing more than the defense theory that a deal was made. If appellants have been unable to develop any probative evidence in the fifteen months since the trial court's ruling, they are in a poor position to contend that denial of the requested continuance prevented them from doing so.
 
 
 74
 It is at least questionable that any additional evidence supporting their theory, even if it had been discovered after trial, would have affected the outcome of this case. In United States v. Dara, 429 F.2d 513 (5th Cir. 1970), we held that merely impeaching or cumulative testimony is not sufficient to warrant a new trial based on newly discovered evidence. In view of the compelling evidence of guilt it is difficult to conclude that such evidence, if it exists at all, would be likely to produce a new result. Ledet v. United States, 297 F.2d 737 (5th Cir. 1962).
 
 
 75
 Appellants have failed to show sufficient prejudice to justify reversal on this issue.
 
 III
 
 76
 The Smiths raise two evidentiary issues that require treatment. Bland testified on redirect examination that he made a trip to Texas to pick up 100 pounds of marijuana at the direction of Bobby Smith. A few moments later Bland also testified that Smith was "seeing" Bland's wife. The Smiths first contend that this evidence placed Bobby Smith's character in evidence in violation of Rule 404 of the Federal Rules of Evidence and was not offered to show motive, plan, scheme, intent or identity.
 
 
 77
 The questioned evidence was allowed only after the defense had cross-examined Bland concerning his prior arrests in Texas and Georgia and the reason for his decision to talk to the FBI. On redirect the prosecution probed into these matters to develop Bland's testimony that he had been directed to purchase the marijuana by Bobby Smith and had elected to talk to the FBI because of Smith's involvement with his wife.
 
 
 78
 We find no fault with defense counsel's cross-examination of Bland concerning his arrests. The Supreme Court's holding in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) is applicable:
 
 
 79
 A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.
 
 
 80
 Id. at 316-317, 94 S.Ct. at 1110. One of this court's recent statements is more to the point: "An accused is entitled to show by cross-examination that the testimony of a witness may be affected by fear or favor growing out of the disposition of pending criminal matters." United States v. Brown, 546 F.2d 166, 169 (5th Cir. 1977). When the witness is the star witness, or was an accomplice or participant in the crime for which the defendant is being prosecuted, the importance of full cross-examination to disclose possible bias is necessarily increased. See Beaudine v. United States, 368 F.2d 417, 424 (5th Cir. 1966).
 
 
 81
 Bland's cross-examination, however, opened the door to a new line of questioning on redirect. Cross-examination on a part of a transaction enables the opposing party to elicit evidence on redirect examination of the whole transaction at least to the extent that it relates to the same subject. Harrison v. United States, 387 F.2d 614 (5th Cir. 1968). We are assisted in our resolution of the present problem by Beck v. United States, 317 F.2d 865 (5th Cir. 1963):
 
 
 82
 When the defense opened up the question . . . the prosecution was properly allowed to counteract that evidence or rehabilitate the witness, even if in doing so the evidence offered made the defendant appear as an unsavory character. As held in United States v. Novick, 2 Cir., 1941, 124 F.2d 107:
 
 
 83
 "And if the evidence was proper rebuttal, the fact that incidentally it implied an illegal act on appellant's part would not bar it."
 
 
 84
 The extent to which counteracting and rehabilitative evidence may be received after the credibility of a witness has been attacked is a matter in which a trial judge has broad discretion. We hold that the trial judge did not abuse his discretion in this case. There was no unfair advantage to the prosecution and no unfair surprise to the defense. Bank of America National Trust & Sav. Ass'n v. Rocco, 3 Cir. 1957, 241 F.2d 455.
 
 
 85
 Id. at 870. In a hearing before trial the Smiths' counsel was specifically warned that if he inquired into Bland's arrests the prosecutor would bring out the questioned testimony on redirect examination. There was no abuse of discretion by the trial judge, nor any actual prejudice or surprise to the appellants in the admission of this testimony.
 
 IV
 
 86
 A similar analysis can be applied to the Smiths' contention concerning the receipt of two investigative files into evidence. The government introduced a Georgia Bureau of Investigation file on its burglary investigation involving Bland and the Harris County Sheriff's Department file covering the investigation of another burglary allegedly committed by Bland. The Smiths brand the files hearsay evidence that identified Bobby Smith, corroborated Bland's testimony and was not introduced to show bias. The government argues that the evidence was not offered to put Bobby Smith's character in issue, but solely to rebut the arrest testimony brought out during Bland's cross-examination.[10] The government maintains that the files were simply meant to show that the statements that led to Bland's arrests on the burglary charges were made by the Smiths.
 
 
 87
 These reports were business records kept in the ordinary course of business and, therefore, fit within that exception to the hearsay rule. In United States v. Halperin, 441 F.2d 612 (5th Cir. 1971), we recognized that
 
 
 88
 Police reports are "business records" under the Business Records Act, Title 28, U.S.C., § 1732. United States v. Martin, 5 Cir. 1970, 434 F.2d 275; Bridger v. Union Railway Company, 6 Cir. 1966, 355 F.2d 382. The police report need only have been made in the regular course of business and the person offering the report be in a position to attest to its authenticity. With these requisites present, the report is admissible. Martin, supra; Bridger, supra.
 
 
 89
 Id. at 618.
 
 
 90
 In this case, application of the business record exception was proper to establish that the arrests about which the Smiths cross-examined Bland to show his bias resulted from complaints or statements made by the Smiths themselves. Even if the introduction of these files had been erroneous, it would have been harmless error under the circumstances before us and in light of the overwhelming evidence against the appellants. See Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). We have reviewed the files and conclude that the substantial rights of neither Bobby nor Barbara Smith were adversely affected.
 
 V
 
 91
 Barbara Smith also challenges the sufficiency of the evidence against her. She was convicted both of conspiracy and of conducting a gambling business. The government dismissed the third count charging interstate transportation of gambling equipment as to Mrs. Smith.
 
 
 92
 Our review of her conviction is controlled by well-established principles. We view the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 45, 86 L.Ed. 680 (1942); United States v. Crockett, 514 F.2d 64 (5th Cir. 1975); Davis v. United States, 385 F.2d 919 (5th Cir. 1967). The verdict of guilty must stand if it is supported by substantial evidence taking the view most favorable to the government, without weighing conflicting evidence or testing the credibility of the witnesses, and allowing all reasonable inferences from the evidence in favor of the verdict. Kroll v. United States, 433 F.2d 1282 (5th Cir. 1970), Cert. denied, 402 U.S. 944, 91 S.Ct. 1616, 29 L.Ed.2d 112 (1971).
 
 
 93
 While no formal agreement or direct evidence is necessary to establish a conspiracy, there must be proof beyond a reasonable doubt that the conspiracy existed, that the accused knew it existed and that with that knowledge the accused voluntarily joined it. United States v. Gutierrez, 559 F.2d 1278 (5th Cir. 1977); United States v. Bright, 550 F.2d 240 (5th Cir. 1977).
 
 
 94
 Participation in a criminal conspiracy may be shown by circumstantial evidence. E. g., Park v. Huff, 506 F.2d 849 (5th Cir.), Cert. denied, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). Conspiracy is almost always a matter of inferences deduced from the acts of the accused. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Whether the evidence is direct or circumstantial, however, the test is whether a reasonably minded jury could find the evidence inconsistent with every hypothesis of innocence. See, e. g., United States v. Prout, 526 F.2d 380 (5th Cir.), Cert. denied, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); United States v. Moore, 505 F.2d 620 (5th Cir. 1974), Cert. denied,421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975).
 
 
 95
 With these standards, provided by law, we first focus on the evidence of the existence of a conspiracy, the object of which was the operation of a lottery in Columbus, Georgia, and Phenix City, Alabama. The enterprise was of the type frequently referred to as the "numbers racket" or more colloquially as the "bug." A person playing the bug normally selects any combination of three numerals and makes a bet on the numbers selected. The winning numbers and the odds paid to the winner are determined by preestablished formula. The individual bets are usually rather small.
 
 
 96
 Charles Michael Bland exposed the inner workings of the operation. He testified that he worked in the lottery operation from July 1975 to January 1977. His testimony verified and tied together the testimony of agents and officers who conducted surveillances and gathered other evidence.
 
 
 97
 Bland's first job was simply to read the daily lottery tickets to find winning tickets and to identify the "writers" who sold or wrote the winning bug tickets. This was called "finding hits." Later he became more familiar with and involved in the operation when he was assigned the job of tallying the tickets turned in each day by each writer. In this job he totaled or computed the amount of money due from each writer based on the number of bets appearing on the tickets turned in. For each writer he prepared an adding machine tape, a ribbon, that reflected the total amount due.
 
 
 98
 From February 1, 1976, through January 1977 Bland was a runner, a person who picked up bug tickets from the writers. He testified that he picked up or collected from eleven writers, each of whom he identified in the courtroom.[11] For convenience and to conceal their identity, each writer was given a code initial or number. Bland identified these code numbers and initials and correlated them with the respective writers.[12] The daily pickup was usually conducted between 1:30 p. m. and 2:30 p. m. Bland was able to identify the location of each writer. Approximately fifty percent of the writers were located in Phenix City, Alabama, and the other fifty percent, in Columbus, Georgia. Other runners during this period were also identified by Bland.[13]
 
 
 99
 After the runners had completed their pickups they proceeded to the switch sites,[14] located at the Henry home or the McCoy house. When the tickets had been picked up and the switch made, either Barrentine or Lee took the day's bug tickets directly to the counting house[15] designated for that day.
 
 
 100
 Bland told of the locations of the different counting houses. Along with Dean Rene Peters and Bobby Joe Lee, Bland was responsible for operating the counting houses. At the counting house each writer's bug tickets were tallied separately, and an individual ribbon identified by code initials or numbers, was prepared. The ribbon showed the total bets from which the writer's commission or percentage, usually twenty percent, was subtracted. The writers were told by telephone the amount of their ribbon for the day. The runners were responsible for collecting the money due from each writer. It was then brought to the counting houses for totaling and for verification against the ribbons. Upon verification the money was taken to either the Edwards' house[16] or the Smiths' trailer. The Smiths' trailer was located approximately 100 yards behind the Edwards' house. The money was usually taken to the Smiths' trailer and was given to either Bobby Smith or Barbara Smith.
 
 
 101
 Bland explained that the winning numbers were determined from the Columbus Ledger & Enquirer, a daily newspaper published in Columbus, Georgia. The numbers appeared at prescribed places within the New York Stock Exchange quotes. As an example he explained the way in which the winning number was found from the April 6, 1977, Enquirer. The last numeral of the winning number was found under the letter "A" in the words "Stock Sales." On this date it was a 3 found on page B-4 of the day's Enquirer. The first two numbers were found under the "L" in the words "Bond Sales." In this instance they were 2 and 9. The winning number on April 6, 1977, was determined in this manner to be 293. In the counting house this number was then written on a yellow piece of paper called the tally sheet which was used in finding hits.
 
 
 102
 After determining the number of winners and the amount of money needed to pay them off, Bland obtained the money to be returned to the writers so that they could pay off the hits. The money was provided from the Smiths' trailer after Dean Rene Peters called the trailer and told the person who answered the telephone the amount needed. This call was made daily between 1:30 and 2:00 a. m.
 
 
 103
 While working in the operation Bland kept a list of the writers' telephone numbers which he furnished to Special Agent Carroll Payne of the Federal Bureau of Investigation. During his testimony Payne verified that he received the phone numbers of the writers from Bland.
 
 
 104
 Talmadge D. Dubose, an Alcohol, Tobacco and Firearms Special Agent; R. T. Boren and Richard A. Watson, Columbus Police Department vice squad detectives; and Carroll J. Payne, a Special Agent in the Federal Bureau of Investigation, testified to a series of surveillances in Phenix City, Alabama, and Columbus, Georgia. They identified the runners, switch persons, a few of the writers, the vehicles used, the location of the various counting houses, the routes of various participants, the pattern of bug ticket pickups, and the payoff system. The surveillances were conducted on numerous days between April 15, 1977, and June 16, 1977, and on each day, Monday through Friday.
 
 
 105
 The government proved that apartments used as counting houses and apparently for no other purpose were rented by various participants in the scheme. Officials of the telephone company in both Phenix City and Columbus provided subscriber names and addresses for the telephone numbers involved. Similarly, testimony of power company employees in those cities established the names in which service to various locations was provided. This testimony pieced together the defendants, the telephone numbers and addresses shown on various exhibits, and the testimony of the officers who conducted the surveillances. In turn that evidence corroborated Bland's testimony in rather meticulous detail.
 
 
 106
 The searches conducted on June 16, 1977, yielded gambling paraphernalia and materials bearing the fingerprints of several defendants and otherwise linked various coconspirators to the conspiracy.
 
 
 107
 A gambling expert who had examined the materials seized during the searches testified as a government witness. During his examination he was able to reconstruct the operation of the entire lottery system. He explained the way in which the three digit lottery worked and the odds in such a lottery. He identified the various code designations that appeared on the seized papers and gambling equipment, which were the same as those previously identified by Bland. On the basis of the seized paraphernalia he was able to calculate that on each day during the week of June 13, 1977, at least $2,000 was bet.
 
 
 108
 The evidence connected each of the appellants to the operation, identified the location of each writer, described the routes used by the runners, established the location of each counting house, and detailed the procedure used to pick up and pay off the bets. The evidence also indicated the relationship of all appellants and ultimately showed the full extent of their involvement in the conspiracy.
 
 
 109
 There was circumstantial corroboration of Bland's testimony that places Mrs. Smith at the pinnacle of the operation as a knowing participant. Even without corroboration, this testimony, which the jury apparently believed, was sufficient to convict Mrs. Smith. This circuit has consistently held that even the uncorroborated testimony of an accomplice is sufficient to support a conviction. United States v. Cabrera, 447 F.2d 956 (5th Cir. 1971); United States v. Stanley, 433 F.2d 637 (5th Cir. 1970). Both circumstantial evidence and direct testimony link Mrs. Smith to the business. A telephone number, ordered or registered in her name, was found on slips of paper carried in the wallets of two coconspirators. The number, 297-5303, was an unlisted number for the telephone service in her trailer. Telephones were located both in the office and in the bedroom of the trailer. The trailer owned by the Smiths was the hub of the operation, and only Bobby and Barbara Smith lived there. The daily receipts were turned over to either Barbara or Bobby Smith. When money was needed to pay off bettors, Peters called telephone number 297-5303, and told whoever answered the phone the amount of money that was needed. This telephone call was ordinarily made in the middle of the night. After the call was made, Bland went to the trailer and got the money, which was placed between the doors. When picking up the money, he occasionally had conversations with Barbara Smith.
 
 
 110
 Applying the previously discussed standards governing our review of the conspiracy charge we have no difficulty in concluding that there was at least substantial evidence of Barbara Smith's guilt and that a reasonably minded jury could find the evidence inconsistent with every reasonable hypothesis of innocence.
 
 
 111
 Barbara Smith was convicted under both the conspiracy count and the substantive count of operating a gambling business. She was sentenced to two concurrent probation terms. In light of our affirmance of her conspiracy conviction, it is not necessary that we review her conviction under the substantive count, since there will be no adverse consequences from application of the concurrent sentence doctrine. See United States v. Ordoneaux, 512 F.2d 63 (5th Cir. 1975).
 
 
 112
 AFFIRMED.
 
 
 
 [1]
 The following persons were indicted: Walter Richard Smith, Jr., Barbara Singleton Smith, Jack Earl Barrentine, Dean Rene Peters, Edna McCoy Hill, Lillie Belle Griggs, Pauline Crenshaw, Curtis Arrington, Emige Dozier, Willie Battle, Noah B. Frazier, R. B. Moore, Olin Whitaker, Jr., Lucille Clark, Dora Thomas, Katie Calhoun, Antonio McCoy, and Bobby Joe Lee
 
 
 [2]
 The following persons were convicted but did not appeal: Antonio McCoy, Katie Calhoun, R. B. Moore, Noah B. Frazier, Willie Battle, Emige Dozier, Curtis Arrington, and Edna McCoy Hill
 
 
 [3]
 Walter and Barbara Smith were represented by retained counsel and filed a separate brief presenting nine claims of error. Bobby Joe Lee, Jack Earl Barrentine, Lillie Belle Griggs, and Pauline Crenshaw appealed in forma pauperis. One attorney was appointed as counsel for these four defendants. The same counsel represented Dean Rene Peters on appeal. He filed a brief on behalf of all five claiming only that a continuance was improperly denied. Peters' notice of appeal had been filed by another, retained counsel. By motion, appointed counsel adopted two of the Smiths' claims of error on behalf of Lee, Barrentine, Griggs, Crenshaw, and Peters. Olin Whitaker, Jr., and Lucille Clark were granted in forma pauperis status and were given the same appointed counsel as the above appellants. By separate motion, appointed counsel adopted these three claims of error on behalf of Whitaker and Clark. Dora Thomas apparently was granted in forma pauperis status and had the same counsel appointed to represent her, but no claims of error were presented to this court on her behalf
 
 
 [4]
 In connection with this general complaint, the Smiths urge that their sixth amendment rights were violated in the following four respects: (1) the trial court erred in failing to allow a continuance to allow retained counsel to be present, (2) the trial court erred in appointing counsel when appellants were already represented by counsel, (3) the trial court erred in failing to grant appointed counsel's request for time to prepare a defense, (4) appellants were denied effective assistance of counsel due to the factual incompetency of appointed counsel. These four claims are interrelated and do not require separate treatment in light of our holding that the Smiths' sixth amendment rights were not violated
 
 
 [5]
 The sixth amendment guarantees,
 In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.
 
 
 [6]
 Appellants filed seventeen different motions on which the district court conducted an extended hearing
 
 
 [7]
 Mr. Nuckolls said that he had not read the indictment and did not see how he could represent the Smiths. He did not represent that he was totally unprepared. On one occasion he had conferred with Mr. Smith in his office. Before trial even began he demonstrated impressive familiarity with at least some of the details of the case. See note 9, Infra
 
 
 [8]
 The following information was requested in the motion for discovery:
 
 
 [25]
 
 The full and complete statement of all promises, rewards, inducements of any kind made by the Government, its prosecutors, its agencies, or its agents, or by any State acting as a result of an explicit or implicit request by the Government to induce or encourage the giving of testimony or information and made to (a) any prospective witness who the Government intends to call at the trial of the above-captioned matter, (b) any witness who testified to the Grand Jury, (c) or any witness who assisted the Government in its investigation and preparation of the above-captioned matter.
 
 
 [26]
 
 The address where "Dusty" Bland and James Vaughn may be interviewed or, in the alternative, to produce "Dusty" Bond (sic) and James Vaughn for an attempted interview. Defendants believe these witnesses are in protected facilities for housing Government witnesses under Public Law 91-452, Title V, Sections 501-504 (84 Stat. 922), and Defendants believe it essential to attempt such an interview.
 
 
 [28]
 
 A full and complete statement of any and all criminal cases presently known by the Government to be pending against "Dusty" Bland and James Vaughn, or any other witness the Government intends to call in its case-in-chief at trial of the above-captioned matter; regardless of whether or not these cases are the subject of a promise, reward or inducement.
 
 
 [29]
 
 A full and complete statement of any and all criminal conduct which the Government has knowledge has been committed by "Dusty" Bland and James Vaughn, or any other witness the Government intends to call in its case-in-chief, regarding which there has been no conviction, regardless of whether or not these crimes are presently the subject of a promise, reward or inducement and regardless of whether or not these crimes are presently the subject of a pending criminal charge.
 
 
 [32]
 
 Any written correspondence, documents, or pleadings reflecting the intervention by the Government on behalf of "Dusty" Bland and James Vaughn, or any other Government witness in any civil actions or proceedings, or any State prosecutions.
 The government filed the following written responses to these inquiries with the indicated results:
 
 
 [25]
 The United States has not made any promises, rewards, or inducements of any kind to induce or encourage the giving of testimony or information to (a) any prospective witness who the government intends to call at the trial of the above captioned matter, (b) any witness who testified to the Grand Jury, or (c) any witness who assisted the Government in its investigation and preparation of the above captioned matter. The United States has not requested either explicitly or implicitly any state or subdivision thereof, or any agents, servants or employees of any state or subdivision thereof, to make any promises, rewards, or inducements of any kind to encourage the giving of testimony or information to (a) any prospective witness who the Government intends to call at the trial of the above captioned matter, (b) any witness who testified to the Grand Jury, or (c) any witness who assisted the Government in its investigation and and preparation of the above captioned matter
 
 
 [26]
 The United States emphatically states that the defendants' belief that Dusty Bland and James Vaughn are in protected facilities for housing Government witnesses under Public Law 91-452, Title 5, Sections 501-504 (84 Stat. 922), is completely erroneous. The United States respectfully declines to state whether or not Dusty Bland and/or James Vaughn Will be witnesses at the trial of this case. We respectfully decline to attempt to provide any address of any prospective witness. We respectfully decline to provide a witness list, or portions of a witness list to these defendants. (Emphasis added.)
 The court denied appellants' request.
 
 
 [28]
 We respectfully decline to provide the information sought in Request No. 28. The Government does not know of any criminal cases currently pending against Dusty Bland and James Vaughn or any other witness which the Government intends to call in its case in chief. (Emphasis added.)
 The court denied appellants' request.
 
 
 [29]
 We respectfully decline to provide the information sought in Request No. 29. The defendants will have the opportunity to cross examine any witness utilized by the Government in its case in chief regarding whether or not they have committed any crimes, whether the United States has made any promised, rewards, or inducements to obtain such testimony. Apparently, the defendants believe that certain named persons, i. e., Dusty Bland and James Vaughn should have information of value to the United States. We will seek to ascertain whether or not this is true prior to the trial, and if it is true, we will use them as witnesses and give the defendants ample opportunity to cross examine them. (Emphasis added.)
 The court denied appellants' request.
 
 
 [32]
 The United States states that there is no written correspondence, documents, or pleadings reflecting the intervention by the Government on behalf of "Dusty" Bland, and James Vaughn, or any other Government witness in any Civil Action or proceedings or any state prosecutions. We have not intervened
 The court was not required to rule in view of the government's response.
 
 
 [9]
 The record discloses that the following exchange took place before trial began on October 31, 1977:
 MR. GARNER (sic): Your Honor, in that event I would like to ask for a continuance. I have information that Mr. Bland has been arrested and is currently awaiting trial in Texas on some drug charge. I also have information he was arrested and is currently awaiting trial in Columbus, Georgia on some burglary charge.
 Your Honor, in the burglary charge in Columbus the state has taken an inordinate amount of time to process these cases. In fact, every case I had in Columbus that has been made around the time that Mr. Bland was arrested, or even months after, has been disposed of, and if I would have known Mr. Bland was going to be a witness I would have looked into why they are not prosecuting Mr. Bland in Columbus.
 MR. SEGREST: Why don't you call the witness?
 MR. GARNER (sic): Well, I would have investigated.
 THE COURT: You have got the time right now, Columbus is only sixty miles from here and the police department can call the police department in Columbus, Georgia, and anyone can be here within two hours. Mr. Segrest will go with you now.
 MR. SEGREST: In regard to the rest of the charges now pending against Charles Michael Dusty Bland, I understand that Charles Michael Dusty Bland was arrested in Texas some time in 1977. I do not know when and in what county. He was arrested for carrying a hundred pounds of marijuana or having in his possession a hundred pounds of marijuana. Those charges he was due to be arraigned on those charges in Texas. At the time he was due to be arraigned he was working for the vice squad of the Columbus police department or had some formal relationship on purely state cases. They called DEA and called and arranged for a continuance of the arraignment. He has not been recontacted by the sheriff in Texas. You can go into that arrest if you want to but I will warn you that he went out there as an agent and servant of Walter Richard Smith, he was going out there for Bobby Smith; so if you want to go into that, live it up. Second thing, since the raid by the United States, and since the affidavit for search warrant got handed to Walter Richard Smith and the co-defendant there have been three charges made against Michael Dusty Bland, one in Harris County, one in Troup County and one in Muscogee County. All three charges are the result of efforts on the part of Walter Richard Smith to have him arrested. Now, I am prepared to prove that in at least two instances, one of them was an anonymous telephone call that told about weapons that could be found at his house. I can also state emphatically that the United States has not requested that any law enforcement agency delay charges against Charles Michael Bland, there are no agreements about those charges that are now pending, we have not asked anybody to delay, nor do we know the full details of those charges. Now, if you would like to get them I think I have requested that the police officer, for example, on the charges in Columbus, I have requested that Ricky Boren bring me some data about those charges, and it will be available to you. On the Harris County, I think the Harris County charge I have the sheriff down here. Walter Richard Smith is the informant that gave information about those charges. On the Troup County, I don't know, but I am willing to make anything available that comes to my attention this afternoon or early this evening about those charges, but that is all I know right now. I think Boren has the Muscogee County charge with him. I have asked Jack Wall, who was the person he was working for with the Columbus police department, the vice squad, he is the director of the vice squad, if there had been any agreement or any attempt on their part in his behalf in connection with any of those charges; there have not been. The only intercession by the vice squad of the Columbus police department was through the DEA to a sheriff out in Texas. We do not know at this time whether the charges are pending or not at this time out in Texas, but I do know that if Bland were questioned about that he would testify that he went out there working for Bobby Smith, that he was arrested; the record out there will reflect that Walter Richard Smith, I understand that he really made his bond, but so you know it is a two-edged sword, but if you go into that I intend to show the source of information. I think it reflects back on this case, but we do not have any agreement and have not attempted to delay those charges in any way.
 
 
 [10]
 Defense counsel were made aware of this testimony in chambers prior to its presentation on the witness stand and were told that such testimony would be elicited if defense counsel chose to impeach Bland with his prior arrests. See note 9, Supra
 
 
 [11]
 The writers were identified as Katie Calhoun, Lillie Belle Griggs, Pauline Crenshaw, Curtis Arrington, Emige Dozier, Willie Battle, Noah B. Frazier, R. B. Moore, Olin Whitaker, Lucille Clark, and Dora Thomas
 
 
 [12]
 The code initials or numbers were identified as follows: Katie Calhoun 8-A, Lillie Belle Griggs 2, Pauline Crenshaw 8, Curtis Arrington C, Emige Dozier XX, Willie Battle W. B., Noah B. Frazier Bob, R. B. Moore R. B., Olin Whitaker 55, Lucille Clark 44, and Dora Thomas 22
 
 
 [13]
 The other runners were identified as Antonio McCoy, Edna McCoy Hill, and Bobby Joe Lee
 
 
 [14]
 At the switch site the pickup men who had received tickets or money from writers turned them over to other participants for delivery to the counting house
 
 
 [15]
 At the counting house tabulations and computations were made and winners were identified. The counting houses were identified as Apt. 111 Ansley Apartments, Apt. 706 Salisbury Park Apartments, 304 S. Seal Road, Apartment 9 at 921 Ft. Benning Road, Rudine Edwards house, 209-E Wilson Road, 2039-B 8th Street, 1712 Ridgecrest Road, and sometimes the Smiths' trailer
 
 
 [16]
 The Edwards house was the home of Bobby Smith's late mother