**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David Brydie MITCHELL, Jose Carlos Prado, Reinaldo Rabeiro, Robert Webster Cary, III, and John Doyle, Defendants-Appellants.**

No. 83–2717.

United States Court of Appeals,
Fifth Circuit.

Nov. 26, 1985.

Rehearings Denied Jan. 2, 1986.

Jerry Coyle, Beaumont, Tex. (Court Appointed), for D. Mitchell.

Jimmy Phillips, Jr., Angleton, Tex., for Prado.

Kazen & Ray, Abraham Kazen, III, Bennie E. Ray, Austin, Tex., for R. Cary and R. Rabeiro.

Michael A. Pedicone, Michael R. Abramovic, Chicago, Ill., for J. Doyle.

Bob Wortham, U.S. Atty., Beaumont, Tex., Robert J. Erickson, Louis M. Fischer, Attys., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before REAVLEY and JOLLY, Circuit Judges, and MAHON *, District Judge.

E. GRADY JOLLY, Circuit Judge.

In this case, charging numerous violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and federal narcotics laws occurring between December 1978 and November 1980, many defendants were involved, and many issues are now raised. Some of the defendants pleaded guilty, some were dismissed, some were acquitted, and of the nine whose cases finally went to the jury, five were convicted. The district court imposed fines upon four and sentenced all to prison terms. All now appeal.

I

The evidence showed that the defendants were engaged in a conspiracy to import large quantities of marijuana from South America to Texas and Louisiana between December 1978 and November 1980. The defendants filled four basic roles in the conspiracy. (1) Suppliers were those who procured the marijuana in South America, and transported it to the Gulf of Mexico in a mother ship. (2) Smugglers took the marijuana from the mother ship to the shore line and then to a point inland. (3) Brokers arranged the transactions between the suppliers, smugglers and the major wholesale buyers. (4) Wholesale buyers, in turn, distributed the marijuana to smaller buyers for sale on the streets.

With two exceptions, the suppliers were either Dario and Enrique Cotes (the Cotes brothers), or Jesus Carnet, none of whom are parties to this appeal. In addition to being a supplier, Carnet also occasionally functioned as a smuggler. Jose Fernandez, who also is not a party to this appeal, played the key role in the scheme by serving as the broker on all shipments. The defendant Reinaldo Rabeiro was Carnet's employee and thus primarily associated with the smuggling operation and, to a lesser extent, the supplier operation. The defendants John Doyle and David Mitchell were major buyers. The defendant Robert Cary captained a vessel used in transporting the marijuana from a mother ship to the Texas shore and was thus associated with the smuggling operation. One of the government's primary witnesses, Diego Morales, helped Fernandez in the smuggling and broker operations by unloading marijuana from trucks, weighing the marijuana and collecting money from the wholesale buyers. The defendant Carlos Prado was also associated with Fernandez and served in the same role as Morales. Fernandez, Prado and Morales will sometimes be referred to collectively as the Fernandez group.

The facts leading up to the defendants' arrest are lengthy and complex. They are contained in a forty-five-volume record and concern events and parties not relevant to this appeal. For simplicity, we will briefly summarize only the material facts surrounding the eleven shipments and each defendant's involvement.

*The Abita Springs Shipment*

The first known activity in this case occurred in December 1978, when the Fernandez group travelled from Miami, Florida, to a farm in Abita Springs, Louisiana, owned by Carnet. There Fernandez sold a marijuana shipment, supplied by Carnet, to Robert Govern, a major wholesale buyer. Morales and Prado participated in the weighing and loading of that marijuana. The Fernandez group later returned to their home base in Miami where Morales and Prado collected the balance of the money owed by Govern. Morales, in turn, delivered some of the money to Rabeiro for delivery to Carnet.

*The Kountze Farm Shipment*

In February 1979, Carnet purchased a farm near Kountze, Texas, to be used as a place in which to conceal the marijuana during the distribution process (known as a "stash" site). Later that month, the Fernandez group travelled to Beaumont, Texas, to await the arrival of one of Carnet's

shipments. When the marijuana arrived, the Fernandez group met Carnet, Rabeiro and others at the Kountze farm. This load was sold to Govern. The Fernandez group later returned to Miami, where Prado and Morales collected payment from Govern and passed some of that payment to Rabeiro for Carnet.

### The Rice Silo Farm Shipment

After the Kountze Farm transaction, Fernandez decided to become a smuggler as well as a broker. To that end Fernandez formed a partnership with Armando Lopez of Houston, Texas, who had represented that he could transport the marijuana from the mother ship to shore and then to a point inland. The Fernandez group travelled to Houston to meet Lopez and Cary to discuss the proposed smuggling operation.

While those discussions were taking place, Carnet informed Fernandez of the expected arrival of another shipment. In preparation, the Fernandez group, along with Lopez, travelled to Beaumont to select a suitable stash site. Unable to find a site, the Fernandez group and Lopez returned to Houston to consult with Doyle, a major buyer. After the meeting Morales accompanied Doyle to inspect a prospective stash site, a farm in LaBelle, Texas, known as the Rice Silo Farm. About a week later, in late April or early May 1979, Carnet notified Fernandez of the precise arrival time of the new shipment. The Fernandez group, Doyle and Mitchell, another major buyer, then travelled from Houston to the Rice Silo Farm. Carnet and Rabeiro arrived to meet the others at the farm shortly after the arrival of the trucks carrying the marijuana. Because of a disagreement among some of the defendants, however, the marijuana was reloaded and driven to Abita Springs, Louisiana. There the Fernandez group, along with Rabeiro, weighed the marijuana and left it to be divided between Mitchell and Doyle.

### The JANICE Shipments

In the meantime, another marijuana shipment had reached the Gulf of Mexico. Fernandez and Lopez functioned both as smugglers and brokers on this shipment. Anticipating the shipment's arrival, the Fernandez group travelled from Miami to Houston where they waited at Lopez's house until Lopez's crew unloaded the marijuana from the M/V JANICE to trucks on shore. The marijuana was delivered to a stash house on Highway 45, north of Houston in late May 1979. Lopez and the Fernandez group split the first delivery between the buyers Govern and Mitchell. Approximately two nights later, Lopez's offloaders transferred the remaining marijuana from the mother ship to the M/V JANICE. The JANICE and marijuana, however, were seized in the early morning hours of May 29, after the vessel ran aground just offshore.

### The Jasper Farm Shipments

In August 1979, an associate of Govern purchased a farm near Jasper, Texas, to use as a stash site. At the beginning of September of that same year the Fernandez group inspected the Jasper farm, and, with the assistance of others, moved trucks, cars, scales, and communications equipment onto the farm. At this point, Prado had been replaced in the Fernandez group by Ruben Perez. In preparation for the next shipment, the Fernandez group established headquarters in a house in Houston, and set up radio communications on a farm on the outskirts of town. The next marijuana shipment, furnished by the Cotes brothers, arrived on or about December 4, 1979. Fernandez and Lopez functioned both as brokers and smugglers on this load. About 8,000 pounds of marijuana was delivered to the Jasper farm on the first night, and the rest of the shipment was successfully offloaded and delivered the following night. Morales and Perez assisted in weighing and distributing the 48,000-pound load. Govern was the major buyer. After the load was distributed, the Fernandez group returned to Houston where Govern paid them between $2 million to $2.5 million.

On December 19, 1979, Carnet imported about ten tons of marijuana and transported it to the Jasper farm. The Fernandez group and Lopez received word that the shipment had arrived and went to the Jasper farm where they met Carnet, Rabeiro and others. The load was weighed and distributed to Mitchell. Following the transaction, the Fernandez group travelled to Miami. In Miami, Morales and Perez collected cash payments from Govern, Doyle and Mitchell. By January 1980, Perez had collected $2 to $2.5 million from Mitchell, about one-half Mitchell's debt for the December 19 load. Perez later made two payments of about $600,000 each to Rabeiro for Carnet.

On or about January 14, 1980, Perez, Morales, and Lopez travelled from Miami to Houston. A shipment from the Cotes brothers arrived on January 15 or 16. On the first two nights, however, those on shore lost contact with the boats. In the early morning hours of January 22, the third night of the operation, a local sheriff arrested Lopez and some of the others. Lopez was later released.

After that failed attempt, Perez and Morales went back to Miami where they collected payment for previous shipments from Govern and Mitchell. Between December 1979, and early February 1980, Perez's collection for prior shipments totalled $15 million to $20 million in cash. On two occasions thereafter, Perez delivered money to Rabeiro for Carnet.

In early February 1980, Perez and Morales met some of Carnet's associates in Houston to discuss the arrival of a new shipment from Carnet. The shipment was delivered, and Perez, Morales, and Rabeiro weighed and distributed this marijuana shipment at the Jasper farm. The major buyers were Mitchell, Doyle and Govern. Once Doyle received his portion, Morales and Perez travelled to Houston to collect payment from Govern, and then to Beaumont where they collected from $90,000 to $100,000 from Doyle. Perez and Morales later travelled to Miami where they collected payment of between $12 million and $15 million from Mitchell, Doyle and Govern for the previous two shipments.

In April 1980, Morales and Perez, with Fernandez's financial support, sought to become smugglers themselves. To effect their plans, they travelled to New Orleans to meet with certain persons who were to provide offloading services. Unknown to Morales and Perez, the people they met in New Orleans were undercover agents from the Drug Enforcement Agency (DEA). As a result of their communications with the DEA agents, the coast guard seized three boatloads of marijuana belonging to the Fernandez group between May and August of 1980. On October 28, 1980, Morales introduced Fernandez to the DEA agents in New Orleans. After further dealings with the agents, Morales, Perez and Fernandez were arrested in March 1981.

The defendants were tried before a jury in district court. Mitchell, Doyle, Prado and Rabeiro were convicted on one count of conducting the affairs of an enterprise through a pattern of racketeering activity, and one count of conspiring to commit that offense. 18 U.S.C. § 1962(c), (d). All defendants were convicted on one count of conspiring to possess marijuana with the intent to distribute, and one count of conspiring to import marijuana. 21 U.S.C. §§ 846 and 963. Mitchell and Rabeiro were convicted on three counts, and Prado and Doyle on two counts of distributing and possessing marijuana with the intent to distribute and aiding and abetting that offense. 21 U.S.C. § 841(a)(1). Rabeiro was convicted on four counts, Mitchell on three counts, and Prado and Doyle on two counts each of importing marijuana and aiding and abetting that offense. 21 U.S.C. § 952; 18 U.S.C. § 2. Finally, Mitchell, Doyle, Prado and Rabeiro were convicted of one count of interstate travel to promote the importation and possession of marijuana, 18 U.S.C. § 1952 (hereafter referred to as the Travel Act). Mitchell, Doyle, Prado and Rabeiro were sentenced to twenty years imprisonment and fined $90,000 each. Cary was sentenced to five years imprisonment.

## II

All defendants contend the district court abused its discretion in failing to grant their motions for continuance both before and during trial. The essence of the defendants' argument is that because of the nature and complexity of the case, and the short length of time between their indictment and the trial date, they were unable to prepare for trial adequately.[1]

The facts underlying the defendants' claim of prejudice are not in dispute. On August 8, the government made available to all defendants the documents it proposed to introduce at trial. Because of this proffer, the court denied all of the defendants' discovery motions. On August 26, the government made a second proffer of exhibits not revealed on August 8, and, at that time notified the defendants of the trial testimony of certain prospective witnesses that was given in other cases. On September 1, the government sent the defendants information concerning expected scientific and expert testimony. The defendants, however, argue that they did not receive it in time to prepare properly. The government also agreed to turn over all Jencks Act and *Gigilio* material to the defendants twenty-four hours prior to trial, but the defendants contend that some of it never arrived, and some of it was made available only as each witness testified or when the defendants discovered that it existed.

We consider these arguments in the light of the well settled rule that the disposition of motions for continuance is vested in the sound discretion of the trial court, which will not be disturbed on appeal except upon a clear showing of abuse of discretion.

Whether an abuse of discretion has occurred is to be decided on a case-by-case basis in the light of all the circumstances. *United States v. Barrentine*, 591 F.2d 1069, 1074 (5th Cir.1979). In addition, a defendant can obtain reversal only by demonstrating serious prejudice. *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1985).

■ At the conclusion of trial, the district court found no disadvantage to the defendants, observing that all defense counsel had been well prepared to try the case. After carefully reviewing the record, we agree with the district court's conclusion. All defendants had over forty days from the time of their arraignment to prepare for trial. Although the government provided a large amount of Jencks Act and *Brady* materials the day before trial, and other such materials during trial, there has been no showing that the defendants failed to receive the materials in time to effectively cross-examine witnesses. In fact, defense counsel used the Jencks Act materials in cross-examining Morales, the first witness to directly implicate any defendant in any criminal activity.

■ Although the government did not produce certain requested video and audio tapes for the defendants' use until midway through the trial, the first request for production of those tapes was made on the day before trial. Thus, under the circumstances, the government's production was timely. Moreover, the court postponed Morales' cross-examination to give defense counsel an opportunity to review the various recordings.

1. The following table indicates the filing date of the defendants' motions and the date of denial by the district court:

| | Motion Filed | Motion Denied |
|---|---|---|
| Prado | August 11 | August 22 |
| Mitchell | August 15 | September 7 |
| Rabiero | August 22 | September 8 |
| Cary | August 26 | September 8 |
| Doyle | September 1 | September 8 |

Beginning September 6 through September 22, all defendants joined in filing a total of seven motions for continuance, all of which were denied by the district court at various times throughout the trial.

■ We also find that the government was excused for failing to provide, prior to trial, the sentencing reduction materials concerning the government witnesses Morales, Perez and Patterson, defendants who had pled guilty and testified for the government. Those materials were not under the prosecution's control, but were sealed by order of other federal courts. When the documents were released they were made available to the defendants in time for use in cross-examination. Under the totality of the circumstances, we are persuaded that the defendants suffered no prejudice from the denial of their continuance motions and therefore hold that the district court did not abuse its discretion in its ruling.

### III

Mitchell contends that the district court erred in denying his motion for continuance because his counsel had a scheduling conflict, thus leaving him without representation at trial. The district court, in a thorough and fully-considered opinion, set forth the facts underlying Mitchell's argument. *United States v. Fernandez,* 576 F.Supp. 397, 399–400 (E.D.Tex.1983). We will briefly summarize the relevant facts here. On July 12, 1983, the case was set for trial. Mitchell appeared before a magistrate on July 26 and 28, but arraignment was postponed on both days because Mitchell had not yet retained an attorney. On July 29, Mitchell again appeared before the magistrate, and at that time an attorney, Kent Schaffer, advised the court that, although he had not been retained, he expected to come to an agreement with Mitchell by that weekend. Arraignment was again rescheduled, and on August 1, Schaffer appeared at Mitchell's arraignment as Mitchell's attorney. The September 7 trial date was given to Schaffer on August 1, yet he did not inform the court of the known conflict. On August 15, Schaffer filed a motion for continuance because he was scheduled for

trial in another federal district court on September 7, a fact he had known since June 13. A federal magistrate denied Mitchell's motion on August 25. The district court denied Mitchell's renewed motion for continuance on September 7, and Mitchell began trial without the presence of an attorney on September 27, after again protesting the fact that the trial was not to be delayed so that Schaffer could represent him. Mitchell was not represented by counsel until sentencing.

■ It is a fundamental principle of due process that a defendant be afforded a reasonable opportunity to be represented by chosen counsel. An accused, however, is entitled only to a *fair or reasonable* opportunity to obtain particular counsel. *Gandy v. State of Alabama,* 569 F.2d 1318 (5th Cir.1978) (emphasis added). The *Gandy* court explained:

> [T]he right to counsel of one's choice is not absolute as is the right to the assistance of counsel. The right to choose counsel may not be subverted to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice. It is a right and a proper tool of the defendant; it cannot be used merely as a manipulative monkey wrench. A defendant cannot assume that the right to choose counsel affords "the right to obtain a delay at his whim and caprice, or to obtain a reversal because he was unable to frustrate justice." Rather, the proper exercise of the trial court's discretion requires a delicate balance between the defendant's due process right to adequate representation by counsel of his choice and the general interest in the prompt and efficient administration of justice.

569 F.2d at 1323 (citations and footnotes omitted).

In determining what was "fair and reasonable," the district court considered certain factors set forth in *Gandy* [2] and made

---

**2.** In *Gandy,* we set forth the following factors to aid the district court in determining whether a continuance should be granted to enable a de-

fendant to have counsel of his choice: (1) the length of the requested delay; (2) whether the lead counsel has an associate who is adequately

the following findings of fact: (1) the delay would have been several months considering the projected length of Schaffer's previous commitment; (2) Schaffer had no associates, but a lawyer who shared office space with him represented two of the other defendants (and presumably could have represented Mitchell); (3) no other continuances were granted; (4) the trial date was set well in advance so that all attorneys, witnesses and the court could be present; (5) Mitchell had knowledge of his attorney's conflict near the time of arraignment; (6) Mitchell and Schaffer requested the continuance in bad faith for the purpose of delay; (7) Mitchell had a one-month opportunity to retain other counsel; and (8) Mitchell attempted to manipulate the court's schedule by retaining an attorney whom he knew to have a conflict. 576 F.Supp. at 403.

█ In addition to considering the *Gandy* factors, the district court relied upon *United States v. Barrentine*, 591 F.2d 1069 (5th Cir.1979), a factually similar case. In *Barrentine*, the defendants and their attorney were notified on October 12 of the October 31 trial date. They moved for a continuance on October 14 because of their attorney's conflicting schedule, but the court denied the motion on October 18. The defendants and their attorney were informed that under no circumstances would the court delay the trial. On the first day of trial, a partner in the defendants' attorney's firm renewed the motion for continuance. The court denied the motion and appointed the law partner to represent the defendants. *Id.* at 1073–75. We affirmed the district court's denial of the continuance, reasoning that the defendants made a calculated attempt to force a continuance by retaining a particular attorney, notwithstanding their knowledge of the court's resolve not to delay the trial. *Id.* at 1075. As in *Barrentine*, Schaffer unquestionably knew of his conflict on the day he was retained as Mitchell's attorney. Neither Schaffer nor Mitchell mentioned the

possibility of a conflict until Schaffer moved for a continuance two weeks later. Although an accused must be afforded a reasonable opportunity to employ and consult with counsel, the Constitution does not give him the power to manipulate his choice of counsel to delay the orderly progress of his case. *Gandy*, 569 F.2d at 1323. Under the circumstances of this case, the district court's finding cannot be overturned and thus it did not abuse its discretion in denying Mitchell's continuance motion.

There is no abuse of discretion even though the denial of the continuance resulted in Mitchell's being unrepresented throughout the trial. The trial date, September 7, was set on July 12. Mitchell and his counsel were present on or before July 29 when other defendants were told that the trial was set for September 7. Since June 13, Mitchell's counsel had been aware of the trial date that presented a conflict. Yet Mitchell employed Schaffer, knowing that Schaffer had a conflict. Still, there was no motion for a continuance until August 15. Even though Mitchell purported to make some last-minute efforts to secure counsel the day before trial, the court found that his seeking a continuance was in bad faith and for the purpose of manipulating the court's schedule. This finding was based on Mitchell's failure to attempt to hire another attorney for more than one month, and his continued insistence that Schaffer, and only Schaffer, represent him. Moreover, the court noted that there were other attorneys sharing offices with Schaffer who possibly could have handled the case; indeed, one of the attorneys sharing office space with Schaffer was involved in the case, representing another defendant. As we have noted, the district court specifically found that Mitchell and Schaffer requested the continuance in bad faith and for the purpose of delay, and that Mitchell attempted to manipulate the court's sched-

prepared to try the case; (3) whether other continuances have been requested and granted; (4) the balanced convenience or inconvenience to litigants, witnesses, opposing counsel and the

court; (5) whether the requested delay is for a legitimate reason or whether it is dilatory and contrived; and (6) whether there are other unique factors present. 569 F.2d at 1324.

ule by retaining an attorney he knew to have a conflict. The evidentiary record reflecting the course of conduct of Mitchell and Schaffer, though perhaps subject to another interpretation, fully supports the conclusion that the district court reached.

■ We have held before, and so hold again today, that failure to secure counsel under such circumstances operates as a waiver of one's right to counsel. In *United States v. Terry*, 449 F.2d 727 (5th Cir. 1971), we upheld the conviction of a defendant who was not represented throughout his trial where the defendant failed to secure counsel of his choice within a reasonable time. Similarly, we upheld the conviction of the defendant in *United States v. Casey*, 480 F.2d 151 (5th Cir.1973), where the court denied a motion for continuance, and the defendant was forced to act as his own counsel. There we held that when insistence on the right to counsel of one's choice is used as a device to manipulate or subvert the orderly procedure of the court, the failure of the defendant to retain an attorney on twenty days notice may be properly treated as a waiver of his right to counsel. And in *United States v. Fowler*, 605 F.2d 181 (5th Cir.1979), we again noted that the grant or denial of a continuance rests in the broad discretion of the trial judge. The defendant there had been first arraigned in March. He had not hired an attorney by October 6, when he appeared before the court for a trial setting. The court set the trial for October 16. Fowler then attempted to hire counsel of his choice who was unavailable on such short notice. On October 12, Fowler moved for a continuance to allow his chosen attorney to represent him. The motion was denied, and the trial proceeded to conviction with Fowler representing himself. In holding that the district court had not abused its discretion in denying the continuance, we noted that no matter how fundamental the right to counsel may be, it may not be used as a means of delaying or trifling with the court. *Id.* at 183.

■ Thus, our holding today continues this line of precedent that motions for continuance are within the sound discretion of the district court. Mitchell had the fundamental right to a reasonable opportunity to obtain a particular counsel of his choice. That reasonable opportunity was afforded Mitchell in this case. Mitchell did not have the right to continue to insist on a particular lawyer and postpone the trial indefinitely, at the expense of the court, its schedule, the government, the other parties, and the orderly administration of justice. The district court is therefore affirmed in its denial of Mitchell's motion for continuance.

## IV

The defendants Prado, Rabeiro, Doyle and Mitchell argue that the government failed to define adequately the alleged "enterprise" in the substantive RICO count of the indictment. 18 U.S.C. § 1962(c). Additionally, Prado, Rabeiro and Doyle argue that the government's proof failed to show a single RICO conspiracy as required by 18 U.S.C. § 1962(d), but rather showed multiple conspiracies. Before addressing these arguments, we consider the necessary elements to prove the respective RICO violations.

■ To establish a section 1962(c) violation, the government must prove the existence of an enterprise, the defendant's employment by or association with that enterprise, and the defendant's conduct of or participation in the conduct of the enterprise's affairs through a pattern of racketeering activity. *United States v. Cauble*, 706 F.2d 1322, 1331 (5th Cir.1983); *United States v. Phillips*, 664 F.2d 971, 1011 (5th Cir.1981). The "enterprise" is not synonymous with the "pattern of racketeering activity," but is an entity separate and apart from the pattern of activity in which it engages. Thus, in every case the government must prove not only that there was a pattern of racketeering activity, but that it was conducted through a defined enterprise. *Cauble*, 706 F.2d at 1331. Section 1962(d) makes it illegal to conspire to violate the above-described substantive provision of RICO. Both section 1962(d) and section 1962(c) require that the enterprise

affect interstate commerce. *Cauble*, 706 F.2d at 1331.

## A.

With the elements of sections 1962(c) and (d) in mind, we examine the sufficiency of the indictment. The purpose of an indictment, of course, is to inform the accused of the charges against him. An indictment is sufficient if it contains the elements of the offenses charged, fairly informs the defendant of the charges he must be prepared to meet, and enables the accused to plead acquittal or conviction in bar of future prosecutions for the same offense. *Cauble*, 706 F.2d at 1333; *United States v. Stratton*, 649 F.2d 1066, 1073 (5th Cir.1981). Here the substantive RICO count defined the enterprise as "a group of individuals associated in fact, to promote and facilitate the illegal importation and smuggling of multi-ton quantities of marijuana * * * into the United States from places outside the United States, and the distribution of said marijuana." The RICO count delineated fourteen acts of racketeering activity by date, specified the participants involved by name, and laid out the elements of the offense. It is clear that the defendants received adequate notice of the charges against them and are able to plead their convictions in bar of future prosecutions for the same offense. The substantive RICO count thus adequately defined the "enterprise" involved.

For the same reasons as those expressed above, we also reject the defendants' argument that the district court abused its discretion in denying the defendants' motions for discovery and a bill of particulars to clarify the "enterprise" alleged in the indictment. Since we have concluded that the "enterprise" was adequately defined, no further clarification was required. We hold that the district court did not abuse its discretion in refusing to order discovery or a bill of particulars.

## B.

Prado, Rabeiro and Doyle also argue that there was a fatal variance between the "enterprise" alleged in the indictment, and the numerous "enterprises" established at trial. In essence, the defendants argue that, because each of the parties in each of the transactions was not identical, each marijuana shipment represented a different and distinct conspiracy rather than the single RICO conspiracy alleged in the indictment. For support, the defendants rely primarily on our decision in *United States v. Sutherland*, 656 F.2d 1181 (5th Cir. 1981). In *Sutherland*, the indictment alleged a conspiracy between a municipal court judge and two others who were to collect traffic tickets from their friends and associates and deliver them to the judge for a favorable disposition. The money collected would, in each case, be divided between the judge and the defendant who collected and delivered the tickets. Although the indictment framed the conspiracy as a single agreement among all three defendants, the government failed to prove any agreement or association between the two defendants who were to collect and deliver the traffic tickets. *Id.* at 1186. Since there was no proof that the two defendants agreed with each other to participate with the judge, nor was the nature of the activity such that each defendant must necessarily have known that others were also involved in the conspiracy with the judge, the court held that the two separate conspiracies could not be tried jointly on a single RICO conspiracy count. *Id.* at 1194.

In reaching its decision, however, the *Sutherland* court observed that the government need not always demonstrate an actual agreement among the various conspirators, or even actual knowledge of each other to establish a single conspiracy. *Id.* at 1190. In some cases the interdependent nature of the criminal enterprise is such that each conspirator had to have realized that the conspiracy extended beyond his individual role. Each individual in this chain-type conspiracy knows that the success of the conspiracy requires an orga-

nization wider than may be disclosed by his personal participation. *Id.* at 1191; *United States v. Elliott,* 571 F.2d 880, 901 (5th Cir.1978). Conspiracies to distribute narcotics, such as the one here, have generally been considered to be a prime example of a chain or interconnected conspiracy in which a participant in a segment of the conspiracy may be convicted of participation in the whole. *United States v. Michelena-Orovio,* 719 F.2d 738, 746 (5th Cir.1983) (en banc).

▇▇▇ The scope of a conspiracy is judged by five factors:

(1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.

*United States v. Marable,* 578 F.2d 151, 154 (5th Cir.1978).

▇▇▇ Unlike *Sutherland,* there was not an impermissible variance in this case between the proof at trial and the enterprise alleged in the indictment, because each of these factors points toward a single RICO conspiracy. There is similarity of time, persons, offenses, places and overt acts among the shipments.

The Fernandez group, occasionally joined by Lopez, functioned as a broker on every shipment. The smuggler's role was filled either by Jesus Carnet and his organization, or by the Fernandez-Lopez partnership. The major buyers on each occasion consisted of Govern, Doyle and Mitchell, either singly or in combination. With the exception of two loads, which were supplied respectively by Jose Segura and a

group known as the Ruffin brothers, all shipments were supplied either by the Cotes brothers or Carnet. Even a cursory review of the facts reveals that most of the defendants were aware of and in fact participated with the other defendants at some point in the many transactions that took place between 1978 and 1980. In short, the unified purposes of the conspiracy to violate drug and anti-racketeering laws, the interconnections among the parties and events, the nature of the statutory offenses charged, the unity of the time period in which the conspiracy was proved to have occurred, the similarity of the places where the conspiracy and overt acts occurred, and the scope of the criminal offense which the government sought to punish lead to the inescapable conclusion that a single conspiracy was alleged and proved.

▇▇▇ The above analysis applies as well to the defendants' argument that the government proved multiple conspiracies instead of the single conspiracy described in the two counts charging conspiracy to import marijuana and conspiracy to possess marijuana with the intent to distribute. As shown above, each defendant knew that his actions were linked to a continuous scheme and that the success of the operation depended upon the fulfillment of each defendant's particular duty. *See Michelena-Orovio,* 719 F.2d at 746–47. There simply was not an impermissible variance between the conspiracy alleged in the indictment and that proved at trial.[3]

### V

All defendants, except Mitchell, challenge the sufficiency of the evidence to support their convictions on various counts of the indictment. Before addressing these issues, it is appropriate here to set forth

---

**3.** Because the government established a single conspiracy, we also hold that the district court did not err in refusing to grant the defendants' pretrial and mid-trial motions for severance. The granting of a severance under Fed.R. Crim.P. 14 rests in the sound discretion of the district court and reversal is not required except upon a showing of "specific and compelling"

prejudice. *United States v. Terrell,* 754 F.2d 1139, 1150 (5th Cir.1985). The same evidence admitted at trial would have been admissible in a separate trial to prove the existence and scope of the RICO and narcotics conspiracies. The district court thus did not abuse its discretion in refusing to grant the severance motions.

our familiar standard of review. In reviewing the sufficiency of the evidence in a criminal case the question is whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Michelena-Orovio*, 719 F.2d 738, 742 (5th Cir. 1983). In considering whether the jury could have found the defendants guilty beyond a reasonable doubt, we must consider the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *Michelena-Orovio*, 719 F.2d at 742. Because of the many defendants and charges involved, we will examine the evidence against each defendant separately.

### A.

*Prado.* Prado challenges the sufficiency of the evidence to support his conviction on the RICO substantive and conspiracy counts, two importation counts, one importation conspiracy count, and one Travel Act count. In the substantive RICO count, Prado was charged with five racketeering acts consisting of one count of violating the Travel Act, two counts of importation, and two counts of distribution. Those racketeering acts concerned his participation in the Kountze and Rice Silo Farm shipments, the December 1978 Abita Springs shipment, and the two JANICE shipments in May 1979.

The evidence was clearly sufficient to support Prado's conviction on the underlying racketeering counts. Prado participated with representatives of both the broker and smugglers in the weighing and distribution of the marijuana, collected money from the major buyers, and made payments to Rabeiro for Carnet, the supplier, on several occasions. Prado's knowledge of the origin of the shipments is also indicated by his trusted position and the large quantities of marijuana involved. *See Michelena-Orovio*, 719 F.2d at 752. The evidence is more than sufficient to support Prado's conviction on the importation conspiracy, importation and distribution counts.

Prado's major argument concerning the sufficiency of the evidence under the substantive RICO count is that the defendants did not cooperate for the advancement of the enterprise. To the contrary, as we have previously mentioned, the evidence clearly reveals that the defendants did cooperate in the function of the enterprise, and that cooperation was essential to its success. Prado's challenge of the evidence under the RICO conspiracy count is that most of the evidence concerned activities occurring after he stopped working for the Fernandez group. Although Prado may not have been a part of the conspiracy from beginning to end, the evidence was sufficient to establish his activity in, and complicity with, the conspiracy. We also note that the district court expressly instructed the jury to consider Prado's claim of early withdrawal from the conspiracy.

In regard to the Travel Act count, the evidence showed that Prado travelled from Texas to Abita Springs, Louisiana, to weigh the Rice Silo Farm load. Because the jury convicted him on the distribution count arising from that shipment, the jury also could have reasonably inferred that his interstate travel aided the marijuana importation and distribution.

### B.

*Doyle.* Doyle argues that his conviction on the distribution conspiracy and importation conspiracy counts must be reversed because the evidence showed that he engaged only in a buyer-seller relationship by purchasing marijuana on occasion. Although Doyle acted only as a major buyer in the operation, his continuing relationship with the other defendants and the sizes of the caches involved establishes his role in the conspiracy to import and distribute marijuana. *See Michelena-Orovio*, 719 F.2d at 752. In addition, Doyle aided the importation of marijuana by assisting Morales in securing the Rice Silo Farm stash house, and by having one of his employees drive a truckload of marijuana from the

farm to Abita Springs, Louisiana. Since the importation was not complete until the marijuana reached its final destination, Doyle aided the importation of marijuana to Texas and Louisiana. *See United States v. Phillips,* 664 F.2d 971, 1031 (5th Cir.1981).

■ The evidence also was sufficient to support Doyle's conviction under the Travel Act. Doyle's assistance in transporting the Rice Silo Farm shipment from Texas to Louisiana where the shipment was weighed and distributed clearly aided the importation, possession and distribution of marijuana. *Cf. United States v. Garrett,* 716 F.2d 257, 266–67 (5th Cir.1983) (interstate telephone call was sufficient to facilitate bribery activity and thus support a Travel Act conviction).

■ Doyle also challenges his conviction for aiding and abetting the importation of the Jasper farm load on the grounds that he did not know that the Jasper farm load was imported. Since Doyle had a continuing relationship with the other defendants as a major buyer, and considering the quantity of marijuana involved, the jury could have reasonably inferred that he was aware that the Jasper farm load was imported. *See Michelena-Orovio,* 719 F.2d at 752.

### C.

■ *Rabeiro.* Rabeiro challenges his conviction on four importation counts, and the Travel Act count. Rabeiro argues that he participated only in transporting the marijuana shipments once they were in the United States and that there was no evidence that he knew of the marijuana's origin. To the contrary, there was sufficient evidence to establish Rabeiro's knowledge and complicity in the marijuana's importation. Rabeiro played a key role in the Carnet organization, the importing source of the marijuana, by participating in the weighing and distributing of marijuana and by collecting multimillion dollar payments on Carnet's behalf. The evidence also showed that he was present at the various points on the Texas coast (known as the "hole") to receive the marijuana and transport it inland. The jury could have reasonably inferred that he saw the boats bringing in the marijuana. Also, it was undisputed that the marijuana imported by Carnet came from Colombia and that others in the Carnet organization knew of its origin. Thus the jury could have reasonably concluded that Rabeiro, associated as he was with the Carnet organization, also was aware of the marijuana's origin.

■ The evidence was also sufficient to support Rabeiro's conviction under the Travel Act. Rabeiro was present at the Rice Silo Farm when a shipment was delivered there in April or May 1979. Morales testified that Rabeiro was one of the members of the Carnet organization who helped weigh the marijuana shipment after it had been transported to Abita Springs, Louisiana. Thus, the jury could have concluded that Rabeiro's interstate travel from Texas to Louisiana aided the marijuana importation and distribution. *See Garrett,* 716 F.2d at 266–67.

### D.

■ *Cary.* Cary contends that the evidence showed only that he was in the company of certain conspirators, but there was no proof that he joined in the conspiracy to import or distribute marijuana. The government concedes that there is little direct evidence to connect Cary to the conspiracy, but argues that the evidence is still sufficient to uphold the jury verdict. Although the evidence concerning Cary's participation in the conspiracy was indeed circumstantial, we hold that it was nevertheless sufficient to sustain his conviction. Cary made a $1,000 earnest money payment for the purchase of the M/V JANICE, and later arranged and paid for several repairs on the JANICE in May of 1979. Cary even paid overtime rates on May 22 to have a navigational aid on the JANICE repaired immediately rather than wait until the next day. Within days, the JANICE was used to transfer 30,000 pounds of marijuana from a mother ship to shore. Cary's

connection with the vessel was also established by evidence that defendant Tarlo chartered the JANICE for one month beginning after the vessel was repaired.

■ More incriminating evidence, perhaps, is that Morales and Lopez discussed the intended use of the JANICE in Cary's presence and that Cary remained silent and did not deny his role in the scheme. The jury could have inferred from Cary's silence, in the context of the other evidence, that he acquiesced in Lopez's description of his role. *See United States v. Caballero*, 712 F.2d 126, 130 & n. 2 (5th Cir.1983). In addition, there is evidence that Cary rented a house in Dickinson, Texas, where communications equipment, including a large radio antenna, was installed to communicate with the JANICE. Approximately 7,000 pounds of marijuana from the first JANICE shipment was sent to that house. When the owner returned to the house in July 1979, he found both the antenna and navigational charts inside. Although the owner of the house could not identify Cary in court, he did testify that Cary looked like the man with whom he had dealt. Moreover, a lease on the house signed by "Robert Cary" was admitted into evidence. The jury could have concluded, in the context of other evidence, that the defendant Robert Cary was the Robert Cary who signed the lease. Although there was no direct evidence to tie Cary to the conspiracy, considering all the evidence in the light most favorable to the government, a jury could have reasonably concluded that Cary was involved in the conspiracy as charged.

### VI

Doyle argues that the district court erred in denying his motion to dismiss the indictment because of prosecutorial misconduct. Doyle asserts that the government abused the grand jury process by having Perez and Morales appear before the grand jury and simply adopt relevant portions of a DEA report rather than present live testimony. Doyle also contends that the grand jurors should have been told that both Morales and Perez were unable to identify a photograph of Doyle two days before their grand jury appearance.

■ The fifth amendment provides that "no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of the grand jury." All that is constitutionally required of an indictment is that it be "returned by a legally constituted and unbiased jury." *United States v. Heffington*, 682 F.2d 1075, 1080 (5th Cir.1982) (quoting *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956)).

■ Here, a magistrate found that in addition to presenting the DEA form, the prosecutor asked both Morales and Perez about their involvement in the scheme, the charges that had been brought against them, and the plea bargains into which they had entered. In addition, the grand jury asked Perez two questions, and both Morales and Perez were available for further questioning. The magistrate also found that it was irrelevant whether the prosecutors disclosed Morales' and Perez' inability to identify a photograph of Doyle, because the witnesses were not asked to identify Doyle before the grand jury. The magistrate concluded that, under these circumstances, the grand jury process was not abused. The district court, after conducting a *de novo* review, adopted the magistrate's findings and recommendation that Doyle's motion be denied. After conducting our own review, we hold that the district court's findings are supported in the record and that Doyle did not meet his burden of proving that the grand jury's will was overborne.[4]

---

**4.** The government also argues that, since there was sufficient evidence to convict Doyle beyond a reasonable doubt, it follows that there was probable cause to institute charges against him, and thus the abuse of the grand jury, if any, is immaterial because it merged into the final judgment of conviction. Because we find that the grand jury process was not abused, we do not address this question.

## VII

The final issue we will address is Doyle's contention that his double jeopardy rights were violated by the court's imposition of consecutive instead of concurrent sentences on the marijuana conspiracy counts, 21 U.S.C. § 846 and the RICO conspiracy count, 18 U.S.C. § 1962(d).

■■■ In resolving this issue, we follow and adopt the analysis of the Second Circuit in *United States v. Thomas,* 757 F.2d 1359, 1370–71 (2d Cir.1985). The *Thomas* court observed several factors that show that Congress intended to allow cumulation of punishment for violations of sections 1962(d) and 846. The legislative histories of section 1962(d) and section 846 reveal nothing concerning the relationship between the two sections. The court also noted that the two sections are in separate statutes and are intended to deter two different kinds of activity—racketeering on the one hand and narcotics violations on the other. Since each statute expressly authorizes punishment for violation of its conspiracy provision, the inference is that Congress intended to authorize cumulative punishment. *Id.* at 1371.

In addition, as the Second Circuit noted, the provisions also meet the test set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) for determining whether the offenses in question are in fact separate. Section 1962(d) requires proof of an "enterprise" engaged in a "pattern of racketeering activity," but section 846 does not. Section 846 requires proof of a narcotics-related conspiracy. Section 1962(d), however, requires only proof of an agreement to commit a felony. Because each provision requires proof of a fact that the other does not, the *Blockburger* test is satisfied. *Thomas,* 757 F.2d at 1371. In conclusion, we hold that the district court did not err in imposing consecutive sentences on Doyle for his violation of sections 846 and 1962(d).

## VIII

There are several remaining issues concerning certain evidentiary rulings of the district court and the propriety of certain comments made by the prosecutor in his rebuttal closing argument. Because these contentions are completely without merit it would serve no useful purpose to discuss them here. It is sufficient to say that we have carefully considered the defendants' remaining arguments, reviewed the record, and have examined the applicable law. We are not persuaded that any reversible error has occurred. In sum, the convictions of all the defendants are affirmed in all respects for the reasons expressed herein.

AFFIRMED.