Revised August 4, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 96-50925**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**FRASIEL HUGHEY,**

**Defendant-Appellant.**

Appeal from the United States District Court
for the Western District of Texas

July 21, 1998

Before WISDOM, SMITH and DeMOSS, Circuit Judges.

DeMoss, Circuit Judge:

Frasiel Hughey was convicted on eleven criminal counts relating to his fraudulent possession and use of counterfeit business checks and credit accounts.[1] Hughey appeals his convictions and certain aspects of his sentence, arguing (1) that

---

[1] Counts 1 and 2 alleged access-device fraud in violation of 18 U.S.C. § 1029(a)(2). Counts 3 through 10 alleged possession of counterfeited securities in violation of 18 U.S.C. § 513. Count 11 alleged a continuing scheme of bank fraud in violation of 18 U.S.C. § 1334.

he was denied his Sixth Amendment qualified right to counsel, (2) that count 2 of the indictment was invalid, and (3) that the district court's order of restitution lacked ample support. We affirm Hughey's convictions on count 1 and counts 3 through 11, reverse Hughey's conviction on count 2, and remand with instructions to enter a modified judgment reducing the amount of restitution ordered.

## HUGHEY'S CONSTITUTIONAL RIGHT TO COUNSEL OF CHOICE

### I.

Hughey first maintains that he is entitled to a new trial with respect to all eleven counts of conviction. He does not challenge the truth of the facts underlying his conviction. Rather, Hughey maintains that the district court's refusal to accommodate defense counsel's conflicting obligation in a later-acquired criminal matter deprived him of his constitutional right to defense counsel of his own choosing. A fairly detailed recitation of the development of this case in the district court is essential to an understanding of this claim.

Hughey was indicted in a two-count indictment in July 1995. Trial was set for October 30, 1995. Hughey's first counsel of record, Douglas McNabb, secured his release on bond and filed twenty-eight pretrial motions seeking to discover the factual and legal basis of the government's case against Hughey. The profusion of motions filed by the industrious McNabb effectively stalled the

case and forced the government to reconsider its strategy.  By early October, it was apparent that neither side would be prepared to try the case on October 30.

On October 2, the parties filed a joint motion for continuance of trial, noting that Hughey's many pretrial motions were still pending, that plea negotiations were ongoing, and that the government might file a superseding indictment.  The district court granted the parties' joint request for continuance and reset the trial for January 8, 1996.

On December 6, the government filed a superseding indictment charging eleven counts.  Hughey terminated his relationship with McNabb and filed a motion to substitute attorney David Botsford, which was granted December 14.  With trial less than one month away, Botsford's first action was to request a continuance of the deadline for pretrial motions until January 8, and a continuance of trial from January 8 until after January 31, 1996.  The government did not oppose the motion.  The district court granted the motion, setting a pretrial motion deadline of January 8 and a trial date of February 5.  The parties later filed an agreed motion to extend the deadline for filing pretrial motions from January 8 until January 15.  The record does not reflect that the district court ever ruled upon that motion.

On January 16, 1996, one day after the requested deadline, Botsford filed seven pretrial motions.  On January 17, Botsford filed a new motion for continuance.  Botsford maintained that

continuance was required to resolve pending discovery issues, to hire a handwriting expert, and to accommodate scheduling conflicts. The scheduling conflicts identified by Botsford were a February 6 appellate briefing deadline before our Court and a firm trial date of February 20 in *United States v. Moore*, a criminal matter pending before the federal district court in Austin, Texas.

With regard to the *Moore* case, Botsford reported that he initially agreed to represent Moore on January 10, subject to making adequate financial arrangements. Botsford further reported that adequate financial arrangements were finalized January 16, and that he planned to make his first appearance in *Moore* on January 17, the same day the motion for continuance of *Hughey* was being filed. Botsford suggested, however, that his representation of Moore might also be conditioned upon a continuance in *Hughey*, by stating that he had informed Moore of the potential for a scheduling conflict and the need to seek a continuance in *Hughey*. Botsford nonetheless asked the district court to "continue the case" until the *Moore* trial was complete. That trial was scheduled to begin February 20 and continue at least through April.

The government responded that it did not oppose a continuance until a date certain in April 1996. The government acknowledged that it was considering a second superseding indictment. The government also recognized that ongoing discovery disputes and Botsford's appellate deadline both provided ample support for

4

continuing the case until April. The government objected, however, to Botsford's request that the case be indefinitely continued pending completion of Botsford's engagement in *Moore*. Given the need to resolve numerous pending discovery issues and the possibility of a second superseding indictment before trial in April, the government was understandably concerned, not only about Botsford's participation at trial, but about his availability to participate in the resolution of pretrial matters.

The government noted that Botsford himself created the alleged scheduling conflict by accepting responsibility for Moore's case after *Hughey* was set for trial and with full knowledge that his work for Moore created a potential conflict with his earlier commitment to Hughey. The government argued that Botsford's desire to represent Moore at trial should not excuse his presence either at pretrial hearings or the trial of Hughey's case in April. The government also requested that the district court order Botsford to provide written assurance that he could resolve Hughey's case in April, irrespective of the *Moore* trial, or to withdraw from the case.

On January 25, the district court granted a third continuance of Hughey's trial until April. On January 29, the district court entered an order formally setting a pretrial motions hearing for April 13 and trial for April 25. The district court accepted the government's position that Botsford's involvement in *Moore* was not

5

a legitimate reason for delaying pretrial proceedings or for continuing the trial of Hughey's case. Accordingly, the district court ordered Botsford to either confirm his availability to resolve Hughey's case in April or withdraw from Hughey's case.

On February 5, Botsford filed a conditional motion to withdraw. Botsford advised the district court that he was unable to confirm his availability for April 1996 and reurged his earlier position that Hughey's case should be continued until the *Moore* trial was complete. Absent an order embracing that position, Botsford stated that he felt compelled to withdraw. Botsford attached Hughey's signed (but unverified) statement objecting to Botsford's withdrawal as a violation of his Sixth Amendment right to counsel of choice. On February 12, the government responded to Botsford's conditional motion to withdraw, stating its preference that Botsford withdraw if, as Botsford stated, the only alternative would be an indefinite trial date contingent upon Botsford's completion of his later-arising commitments in *Moore*.

On February 15, the district court granted Botsford's conditional motion to withdraw and ordered Hughey to select alternative counsel. Hughey then hired his third attorney, Jack Pytel, who first appeared on February 22.

Hughey's trial was eventually reset on two more occasions. On April 10, the district court sua sponte reset the trial from April 25 to May 13. That delay was occasioned by Hughey's arrest for

6

further criminal activity while released on bond and the need to consider issues raised by the government's second superseding indictment. Hughey's trial was postponed a fifth and final time when the district court granted Hughey's unopposed motion to continue the trial date until July. Although Hughey's formal motion for continuance was based in large part on Pytel's scheduling conflicts, the record reflects that the parties were also actively engaged in resolving pretrial and bond revocation issues.

One week prior to the final motion for continuance, the parties appeared in the district court to argue pretrial motions. One week after the motion for continuance was filed, the parties appeared again to litigate whether Hughey's bond should be revoked. Hughey's trial eventually began on July 15, 1996.

## II.

The Sixth Amendment guarantees the assistance of counsel in all criminal prosecutions. U.S. CONST. amend. VI. That guarantee has long been construed to include a criminal defendant's qualified right to retain counsel of the defendant's own choosing. *E.g.*, *United States v. Wheat*, 108 S. Ct. 1692, 1697 (1988); *Morris v. Slappy*, 103 S. Ct. 1610, 1615-18 (1983); *Powell v. State*, 53 S. Ct. 55, 58 (1932); *United States v. Paternostro*, 966 F.2d 907, 912 (5th Cir. 1992).

Hughey argues that trial lawyers are not fungible, and therefore, the Sixth Amendment must be construed to afford him the right to insist upon Botsford's services in particular. Hughey also claims that the district court erred by (1) ordering Botsford to either make a firm commitment to Hughey's case or withdraw, and (2) refusing to grant a continuance until an indefinite date tied only to Botsford's completion of his obligations in Moore's trial.

Hughey miscomprehends both the scope of the relevant right and the competing concerns of adversarial fairness to which it may be subjected. While we concur that trial lawyers are not for the most part fungible, the Sixth Amendment simply does not provide an inexorable right to representation by a criminal defendant's preferred lawyer. **Wheat**, 108 S. Ct. at 1697; **Paternostro**, 966 F.2d at 912; **United States v. Mitchell**, 777 F.2d 248, 256-58 (5th Cir. 1986). Indeed, "there is no constitutional right to representation by a particular attorney." **Neal v. Texas**, 870 F.2d 312, 315 (5th Cir. 1989); see also **Wheat**, 108 S. Ct. at 1697; **Paternostro**, 966 F.2d at 912; **Mitchell**, 777 F.2d at 258. The Sixth Amendment right to counsel of choice is limited, and protects only a paying defendant's fair or reasonable opportunity to obtain counsel of the defendant's choice. **Paternostro**, 966 F.2d at 912; **Neal**, 870 F.2d at 315; **Mitchell**, 777 F.2d at 256; **Gandy v. Alabama**, 569 F.2d 1318,

1323 (5th Cir. 1978).[2]

Hughey was afforded that opportunity. The district court's order granting Botsford's motion to withdraw afforded Hughey five days to find alternative counsel. While Hughey objected to Botsford's withdrawal, Hughey made no objection that he was unable to secure competent alternative counsel in the time period provided. *Cf.* ***Ungar v. Sarafite***, 84 S. Ct. 841, 850 (1964) (finding five days to be a constitutionally sufficient time period to retain counsel for scheduled contempt hearing).

Further, Hughey exercised his Sixth Amendment right by independently selecting Pytel. Pytel assumed responsibility for Hughey's defense many months in advance of trial, and he diligently represented Hughey through trial and sentencing. Thus, this is not a case in which the district court's action resulted in the defendant being forced to trial with an inadequately prepared attorney or no attorney at all. *See, e.g.*, ***Paternostro***, 966 F.2d at 912-13; ***Neal***, 870 F.2d at 315-16; ***Mitchell***, 777 F.2d at 756-58;

---

[2] This limitation finds support in the purpose of the Sixth Amendment guarantee, which is to provide a fair trial. ***Wheat***, 108 S. Ct. at 1697; ***Slappy***, 103 S. Ct. at 1617-18. When examining any alleged deprivation of the right to counsel, we must therefore focus upon the integrity of the adversarial process, not on the defendant's relationship with any particular lawyer. ***Wheat***, 108 S. Ct. at 1697 (quoting ***United States v. Cronic***, 104 S. Ct. 2039, 2046 n.21 (1984)); *see also* ***Slappy***, 103 S. Ct. at 1617 (there is no constitutional right to a "meaningful relationship" with defense counsel).

***Gandy***, 569 F.2d at 1327.[3]

Hughey's subsequent actions demonstrated that he was proceeding with his counsel of choice. Notwithstanding the fact that he was not tried until July 1996, Hughey made no attempt to reinject Botsford into the case. In April 1996, Hughey stated in open court that he was satisfied with Pytel's representation and wanted to continue with Pytel as his lawyer without regard to any conflict of interest that may have existed as a result of Pytel's representation in another matter.

Hughey claims that he renewed his objection to Botsford's removal at sentencing. Near the conclusion of the sentencing hearing, Hughey was asked whether he had any comments prior to the imposition of sentence. Hughey opined that the circumstances surrounding Botsford's removal might provide a fertile ground for reversal on appeal. Hughey did not, however, express any dissatisfaction with Pytel's services or reiterate a preference for Botsford's services, at that or any other time. *See **Slappy***, 103 S. Ct. at 1617 (observing that the record did not support an inference that the defendant continued to prefer prior counsel, who

---

[3] Even in these more sympathetic cases for constitutional relief, we have been reluctant to afford relief where the defendant failed to capitalize on a fair or reasonable opportunity to secure counsel. *See, e.g.*, ***Paternostro***, 966 F.2d at 912-13; ***Neal***, 870 F.2d at 315-16; ***Mitchell***, 777 F.2d at 256-58 (all finding no constitutional error where the trial court's refusal to grant a continuance forced the defendant to trial without retained counsel); *see also **Ungar***, 84 S. Ct. at 849.

10

was unable to appear at trial, and that the defendant had "specifically disavowed any dissatisfaction with [replacement] counsel," who did appear at trial).

Hughey had a fair *and* reasonable opportunity to replace Botsford. Hughey exercised his Sixth Amendment right by independently selecting and retaining Pytel, and by voicing his desire to continue Pytel's services notwithstanding any conflicts. There is no allegation that Hughey's counsel was denied an adequate opportunity to prepare a defense. There is no allegation that Pytel's representation was in any way deficient. Despite the fact that Hughey was tried well after the **Moore** case was scheduled to end, Hughey never sought to reintroduce Botsford to the case. We thus conclude that Hughey was afforded a fair or reasonable opportunity to select counsel, which is all the Sixth Amendment guarantees.

## III.

Hughey argues that the district court's February 15 order requiring Botsford to either commit to a firm trial date or withdraw deprived him of his constitutional right to counsel of choice. An arbitrary or unreasonable action that impairs the effective use of counsel of choice may violate a defendant's constitutional right to due process of law. **Ungar**, 84 S. Ct. at 849-50; **Neal**, 870 F.2d at 315; **Mitchell**, 777 F.2d at 256; **Gandy**,

11

569 F.2d at 1323-26.[4]   The counsel of choice theme of the Due Process Clause is qualified, and may be made subject to competing concerns about the effectiveness of the adversarial process.  *See Wheat*, 108 S. Ct. at 1697;  *Mitchell*, 777 F.2d at 256; *Gandy*, 569 F.2d at 1323 & n.9.  There are many circumstances in which purely private concerns or the orderly administration of justice may require that a defendant's first, or even second, choice of counsel must give way.  *See, e.g.*, *Wheat*, 108 S. Ct. at 1697 ("a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant"); *Mitchell*, 777 F.2d at 257 (a defendant had no constitutional right "to continue to insist on a particular lawyer and postpone the trial indefinitely, at the expense of the court, its schedule, the government, the other parties, and the orderly administration of justice"); *Barrentine*, 591 F.2d at 1075 (the defendants had no constitutional right to unavailable counsel); *Gandy*, 569 F.2d at 1323 ("the right to choose counsel may not be subverted to obstruct

---

[4]     The "counsel of choice theme" of due process protection appears to have developed in cases involving a state law conviction, in which it would have been necessary to hold that the Sixth Amendment guarantee of counsel is a right incorporated by the Fourteenth Amendment.  *E.g.*, *Neal*, 870 F.2d at 315; *Gandy*, 569 F.2d at 1320-25.  Since then, however, that doctrine has developed into a distinct due process analysis for claims involving federal convictions.  *E.g.*, *Mitchell*, 777 F.2d at 256-58; *United States v. Barrentine*, 591 F.2d 1069, 1075 (5th Cir. 1979).

12

the orderly procedure in the courts or to interfere with the fair administration of justice").

Hughey contends that the district court's February 15 order left Botsford with no other choice but to withdraw because, due to circumstances beyond his control, Botsford was unable to commit to an April trial date. We disagree. Botsford himself created the conflict that forced a choice between Hughey's case and Moore's.

Hughey maintains on appeal that Botsford had no idea there could be a conflict when he accepted Moore's case. Hughey further claims that Botsford firmly believed that Hughey's case would be tried on February 5, and that it would be concluded before the February 20 date on which Moore's case was scheduled to be tried. But Botsford filed an unopposed motion to continue Hughey's case the day after he reached an agreement with Moore. In that motion, Botsford expressly recognized the possibility that Moore potentially compromised his commitment to Hughey, by stating:

> The undersigned has never before got himself into such a position and the undersigned apologizes to the Court for the situation. However, when a citizen who professes his innocence virtually begs for your assistance, it is extremely difficult to say "no."

We can only conclude that Botsford was aware that his agreement to represent Moore potentially compromised his obligations to Hughey when he agreed to take the case.

We likewise disagree that the order left Botsford without any choice but to withdraw. Botsford could have temporarily withdrawn

13

and then rejoined Hughey's defense once the *Moore* trial was complete. Botsford could have associated counsel and divided the work load to permit his appearance at key events in both cases. Botsford could have unequivocally committed to a firm date in the future without regard to the *Moore* trial. Notwithstanding those options, Botsford refused to offer any accommodation that would have permitted him to retain Hughey's case.

Hughey seeks to impugn the district court's exercise of its discretion by suggesting that Botsford required only a short extension of the April trial date to which the government had already agreed. Thus, Hughey claims that Botsford essentially agreed to a May 1996 trial date. Again, we must disagree. Botsford's own pleadings acknowledge that pending motions in *Moore* were threatening to derail the scheduled trial date in that case, and Botsford was unwilling to make any commitment to Hughey's case that was not contingent upon completion of *Moore*.

Hughey likewise suggests that Botsford's request was limited to a continuance of the trial setting, and that there was never any question about his availability to participate in pretrial hearings. But Botsford's motion for a continuance is not so limited. Botsford asked that the district court "continue the case" until completion of the *Moore* trial. That request can be fairly read as a request to continue all proceedings in Hughey's case until the *Moore* trial was complete.

14

When Botsford moved for continuance, there were a number of pretrial motions pending. The government was discussing the possibility of a second superseding indictment. In addition, the day after Botsford filed his conditional motion to withdraw (and before the government responded to that motion) Hughey was arrested for further criminal conduct. That development further complicated the case by creating the need for a contested bond revocation hearing before trial. Given the posture of the case at the time and the phrasing of Botsford's motion for continuance, we cannot say that the district court acted unreasonably in requiring that Botsford clarify how he would handle the *Moore* trial, scheduled to begin shortly, and Hughey's case at the same time. *Hornbuckle v. Arco Oil & Gas Co.*, 732 F.2d 1233, 1236 (5th Cir. 1984) ("trial lawyers are obligated to undertake no more responsibility than they can responsibly handle").

Trial courts "have both the power and the duty to take measures to control their dockets and to ensure that counsel properly prepare cases scheduled for trial so that they can be tried and decided rather than continued and rescheduled." *Hornbuckle*, 732 F.2d at 1237; *In re Air Crash Disaster*, 549 F.2d 1006, 1019 n.18 (5th Cir. 1977) ("Though an attorney has a conflicting engagement the court may decline to postpone his case, necessitating his associating other counsel to handle one of the two commitments."). While we are somewhat troubled by the facially

15

compulsory nature of the district court's order, we are loathe to find error where the district court acted to ensure that Hughey would be adequately represented by prepared and available counsel -- in other words, to secure for Hughey's benefit the very protections which he now claims he was denied. The district court's efforts in this regard place this case in stark contrast to *Gandy v. Alabama*, 569 F.2d 1318 (5th Cir. 1978), the principal case upon which Hughey relies.

In *Gandy*, a state prisoner sought a writ of habeas corpus, alleging that the state trial court's refusal to grant a trial continuance violated his constitutional right to counsel of choice. *Id*. at 1319. Gandy's defense lawyer abandoned his case in favor of another engagement on the first day of Gandy's trial. *Id*. at 1320. When the state court insisted that the matter would proceed to trial, Gandy was represented by a lawyer completely unfamiliar with the case. *Id*. Our Court noted that the state trial judge "failed to take any steps to assure the continued attendance" of Gandy's retained lawyer. *Id*. at 1326. Thus, in *Gandy*, the state trial judge allowed defense counsel's schedule to prejudice the defendant's substantial rights. *Id*. In this case, the district court's proactive, if somewhat intrusive, efforts prevented Hughey's rights from being similarly prejudiced.

Faced with the prospect of making an independent commitment to Hughey's pre-existing case, Botsford chose to withdraw. Based upon

16

the record, we can reach no other conclusion but that Botsford preferred his later-acquired representation in **Moore**. Hughey was not constitutionally entitled to unavailable counsel. **Barrentine**, 591 F.2d at 1075. While the record was carefully prepared for this appeal, Hughey's subsequent actions demonstrate that he was neither deprived of able counsel nor intent upon Botsford's representation in particular. We find no abuse of the district court's discretion and no deprivation of Hughey's constitutional right to due process in the district court's February 15 order requiring Botsford to make a firm commitment to Hughey's case or to withdraw.

## IV.

Hughey also claims that the district court's refusal to grant an indefinite continuance tied to completion of the **Moore** trial was an abuse of discretion. A trial court's arbitrary or unreasonable refusal to grant a continuance to accommodate a defense lawyer's scheduling conflicts may render the trial fundamentally unfair. *See, e.g.*, **Ungar**, 84 S. Ct. at 849 ("a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality"); *see also* **Slappy**, 103 S. Ct at 1616; **Mitchell**, 777 F.2d at 256-58; **Gandy**, 569 F.2d at 1320-24.

But not every denial of a continuance in this context is a deprivation of due process. *Id*. at 1322. "Trial judges

17

necessarily require a great deal of latitude in scheduling trials." *Slappy*, 103 S. Ct. at 1616; *see also* **Ungar**, 84 S. Ct. at 849; **Mitchell**, 777 F.2d at 255. A trial court's exercise of its discretion to either grant or deny a continuance will not be disturbed on appeal absent a clear abuse of discretion. **Neal**, 870 F.2d at 315; **Mitchell**, 777 F.2d at 255.

Our Court has resolved the apparent tension between the defendant's right to counsel of choice and the district court's need to manage its docket by holding that only an arbitrary or unreasonable denial of a requested continuance will constitute a violation of the defendant's Fifth or Sixth Amendment rights. *See* **Gandy**, 569 F.2d at 1322-23. If the challenged decision is neither arbitrary nor unreasonable, we must uphold the trial court's decision to deny the continuance, even when we consider the decision to be a harsh one. **Neal**, 870 F.2d at 315.

The decision whether to grant a continuance in such a situation requires a "delicate balance between the defendant's due process right to adequate representation by counsel of his choice and the general interest in the prompt and efficient administration of justice." **Gandy**, 569 F.2d at 1323. There are no mechanical tests for making this determination, which is uniquely dependent upon the circumstances presented in every case. **Ungar**, 84 S. Ct. at 850. Our precedent establishes, however, that several factors are routinely relevant to this inquiry. Those factors include: (1)

18

when the request for continuance was filed; (2) the nature of the reasons offered to support the continuance, particularly where there is reason to believe that those reasons are either less than candid or offered in bad faith; (3) the length of the requested delay; (4) the number of continuances previously granted; and, the great catch-all, (5) the general balance of convenience to the parties and the court. *See* **Gandy**, 569 F.2d at 1324; *see also* **Slappy**, 103 S. Ct. at 1617; **Ungar**, 84 S. Ct. at 850; **Mitchell**, 777 F.2d at 257-58.

Botsford filed the subject motion to "continue the case" on Hughey's behalf about three weeks before trial, and on the same day that Botsford reached an agreement to represent Moore. When the motion was filed, there were numerous pretrial motions pending, many of which required a decision prior to trial. Hughey's request for a continuance was supported by several factors. With the exception of Botsford's agreement to represent Moore at trial, none of those factors would have required a continuance beyond the April 1996 trial date already accepted by the government, and eventually set by the district court. Thus, the relevant decision to be examined is the district court's refusal to continue Hughey's case until an uncertain date when Botsford was finished with the **Moore** trial.

When Botsford filed Hughey's motion for continuance in January 1995, the case had already been continued twice. Although those

19

continuances were granted on the basis of agreed or unopposed motions, the fact remains that Hughey had been awaiting trial since July 1995. The district court effectively granted a third continuance by moving the trial date back to April 1996. Hughey's argument is that the district court's refusal to grant what was in effect a fourth continuance to accommodate his second defense counsel's newly-acquired scheduling conflict deprived him of due process.

The district court's refusal to grant such a continuance, like the granting of the motion to withdraw, was neither arbitrary nor unreasonable. Botsford refused to offer any accommodation that would have enabled him to handle both cases, and he maintained that he could not proceed in *Hughey* absent an order tying Hughey's trial date to the completion of his representation of Moore. Hughey's third lawyer, Pytel, assumed responsibility for the case well in advance of trial. Thus, Hughey was not forced to trial without adequately prepared counsel or without any counsel at all. Hughey has not offered any other facts that would support the conclusion that he was denied a fair trial.

We cannot say on the basis of this record that Hughey's interest in Botsford's particular services was so strong as to override those interests protected by the district court's action. Those interests, were they neglected, would have soon impacted the substantial constitutional rights of Hughey and other criminal

20

defendants.  We conclude that the district court's refusal to grant an additional continuance that would have been justified only by Botsford's newly-acquired scheduling conflict and would have continued Hughey's trial to an uncertain date tied only to the end of Botsford's competing obligation was not an abuse of discretion. To the contrary, that refusal protected both the adversarial process and Hughey's substantial rights.  On the facts of this case, there was no deprivation of Hughey's Fifth Amendment right to due process of law.

**V.**

Based upon the circumstances presented, we find no deprivation of Hughey's Sixth Amendment right to counsel of choice or his Fifth Amendment right to due process of law.  Our holding is necessarily limited to the particular facts of this case. *See **Ungar***, 84 S. Ct. at 850 ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.").  In particular, we disclaim any general rule that would routinely place a district court's generalized need to proceed promptly in a superior position to defense counsel's legitimate scheduling conflicts.  Scheduling conflicts must be hammered out, as they are every day, by mutual

21

accommodation and with an ever-vigilant eye on the defendant's right to proceed with counsel that is adequately prepared and competent to provide constitutionally sufficient representation. In this case, the defendant was afforded a fair or reasonable opportunity to proceed with his second choice of counsel, who was adequately prepared and competently represented Hughey through trial. We likewise find it significant that the district court did not unconditionally require Botsford's withdrawal. Rather, the district court conditioned Botsford's continuing appearance on some assurance that he would be prepared to try the case at some definite time. Defense counsel created the scheduling conflict himself and then refused to engage in that mutual accommodation that must accompany requests for a continuance on the basis of scheduling conflicts.

Likewise, we agree with Hughey that defense lawyers are not fungible and that a defendant's choice, even his first choice, of counsel may be entitled to significant weight in the decision whether to grant a continuance. That does not mean, however, that a defendant may effectively hold a federal district court and the prosecutorial arm of the government hostage for an indefinite period of time pending completion of whatever criminal matter may be acquired or require priority treatment. We therefore hold that neither the district court's order requiring Botsford to commit to Hughey's case or withdraw nor the district court's refusal to grant

22

a continuance tied to Botsford's completion of the **Moore** trial deprived Hughey of his constitutional rights. Hughey makes no other argument capable of requiring relief with respect to his convictions on count 1 and counts 3 through 11. Accordingly, Hughey's convictions with respect to those counts are affirmed.

## HUGHEY'S CHALLENGE TO COUNT 2 OF THE INDICTMENT

### I.

Hughey argues that count 2 of the indictment was impermissibly duplicitous. We agree that count 2 is defective. Rather than charging two separate offenses, however, count 2 charges no federal offense at all. We therefore reverse Hughey's conviction with respect to that count.[5]

Count 2 charged use of an unauthorized access device in violation of 18 U.S.C. § 1029(a)(2) and (b)(1). The statute provides:

> whoever . . . knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period . . . shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

---

[5] Given the concurrent nature of Hughey's sentences, the relief afforded with respect to this issue should not affect the total term of Hughey's sentence. The relief will, however, require a reversal and refund of the $50 special assessment imposed with respect to count 2 and the entry of a modified judgment excluding the conviction on count 2.

23

18 U.S.C. § 1029 (a)(1). Section 1029(b)(1) provides that an attempt to violate § 1029(a) will be punished under the same provision governing a substantive violation of § 1029(a). 18 U.S.C. § 1029(b)(1). The applicable version of § 1029[6] defines an unauthorized access device as follows:

> (e) As used in this section --
>
>    (1) the term "access device" means any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access device to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (*other than a transfer originated solely by paper instrument*).
>
> * * *
>
>    (3) the term "unauthorized access device" means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud.

18 U.S.C. § 1029(e)(1) & (3) (emphasis added).

Section 1029 was passed to stem the tide of large-scale fraud arising from the unauthorized use and counterfeiting of credit cards, debit cards, and the account numbers assigned thereto. S. Rep. No. 98-368, at 2, 10 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3648, 3656; H. R. Rep. No. 98-894, at 4-5, 6-8 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3689-91, 3692-94. Congress drafted the statute broadly to include any fraud arising from unauthorized use or

---

[6]    Section 1029 has been amended twice since the time of Hughey's criminal conduct. Neither of these amendments is material to or applicable to Hughey's appeal.

24

counterfeiting of credit cards, debit cards, account numbers, or other devices capable of affording account access, such as by electronic transfer. *See* S. Rep. No. 98-368, at 10. Congress intended that the definition of an access device be broad enough to include devices that were not then contemplated, but which by way of technological development might become available as a means of affording unlawful account access. *See* S. Rep. No. 98-368, at 10; H.R. Rep. No. 98-894, at 19. Congress did not, however, intend to enact a comprehensive scheme that would completely supplant state law regulation of similar conduct. To the contrary, § 1029 was intended to supplement the efforts of state and local governments by encompassing only the more serious and extensive fraudulent schemes. *See* H.R. Rep. No. 98-894, at 13; *see also* S. Rep. No. 98-368, at 5 ("While the federal interest is clear . . . federal involvement was neither necessary nor desirable in the routine case. Rather, the committee was urged to report legislation which would zero in on major counterfeiting and trafficking activities."). Thus, Congress restricted the scope of § 1029 to those areas where federal intervention was perceived to be either useful or necessary. H. R. Rep. No. 98-894, at 13. For example, the statute does not apply when the offense involves less than $1000. 18 U.S.C. § 1029(a); *see also* H.R. Rep. No. 98-894, at 13. Similarly, the plain text of the statute makes § 1029 inapplicable to conduct involving "(transfer[s] originated solely by paper

instrument)." 18 U.S.C. § 1029(e)(1). That parenthetical exclusion unambiguously places the passing of bad checks and similar conduct outside the scope of the federal statue. *See* S. Rep. No. 98-368, at 10 ("By specifically excluding transfers of funds originated solely by paper instrument, it covers offenses such as those included in the Electronic Fund Transfer Act, but does not cover activities such as passing bad checks." (footnote omitted)); H.R. Rep. No. 98-894, at 19 ("This would cover credit cards, debit cards, account numbers, and combinations of these and other methods of obtaining money, goods and services. The definition of this term is broad enough to encompass future technological changes and the only limitation i.e., '(other than a transfer originated solely by paper instrument)' excludes activities such as passing forged checks."); *see also* **United States v. Caputo**, 808 F.2d 963, 966 (2d Cir. 1986) (citing legislative history for the same proposition).

Count 2 charged that Hughey unlawfully used two checking accounts to obtain funds aggregating more than $1000. With respect to the first account, the evidence showed that Hughey, using an alias, opened a checking account at First Interstate Bank in Houston, Texas. Between August 9 and August 11, 1993, Hughey deposited four counterfeit checks purportedly issued by Houston Light & Power (HL&P) into the First Interstate account. The checks bore the correct account and bank routing number for HL&P's account

26

with Texas Commerce Bank (TCB). Hughey received $2000 cash back when he deposited each of the four checks. The losses on these checks, and others passed during the same time period by Hughey against HL&P's account with TCB, were shared by TCB and HL&P.

With respect to the second account, the evidence showed that Hughey and his college friend Wilbur Tippins agreed to pass counterfeit checks at an H.E.B. grocery store (HEB) in San Antonio, Texas. Tippins secured the help of his girlfriend, Vanessa Wilson, who worked in the check-cashing booth of the store, and his cousin, Mary Thomas. Hughey and Tippins, with the help of Wilson and Thomas, successfully caused a number of counterfeit checks to be presented and cashed at HEB. The parties shared the proceeds of the checks as they were cashed.

In September 1993, Wilson and Thomas agreed to cooperate with a sting operation designed to catch Hughey and Tippins. Wilson called Tippins and told him to bring more checks to HEB.

Tippins and Hughey completed six counterfeit checks purportedly issued by a company named Central Linen. The pair then met Thomas at HEB. Tippins and Thomas cashed two of the Central Linen checks, while Hughey waited outside in his truck. Agents moved in to arrest Hughey, but he evaded arrest and remained at large for many months.

In addition to Hughey's conduct in relation to the HL&P checks, the government also charged Hughey's conduct in relation to the Central Linen checks in count 2. The Central Linen checks were

27

drawn on a closed account at Randolph-Brooks Federal Credit Union, which had previously been assigned to an individual account holder. HEB took the loss on all checks passed at the San Antonio grocery store.

The conduct charged in count 2 concerned only transfers "originated solely by paper instrument"; specifically, the creation and presentation of bad checks at First Interstate Bank and an HEB grocery store. Such conduct is not within the ambit of the conduct that Congress sought to prohibit in § 1029. Therefore, count 2 fails to allege any offense that may be prosecuted under that section, and Hughey's conviction must be reversed.

The government argues that Hughey's conviction on count 2 may nonetheless be affirmed because Hughey was in possession of account numbers which *could have been* used, in conjunction with other codes, to obtain access to those accounts. For example, the government argues that Hughey could have used the account numbers, in conjunction with additional codes, to make an electronic transfer by telephone. The government's "potential use" theory relies upon that portion of § 1029(e)(1) which defines an access device to include anything that "can be used, alone or in conjunction with another access device," to obtain anything of value. § 1029(e)(1). That phrase was included to clarify that the statutory definition includes those devices which "may be used in connection with accounts but which themselves may not be 'access

28

devices.'" H.R. Rep. No. 98-894, at 19. Thus, the government's position appears to be that the account numbers were access devices because of their inherent potential for use with other devices.

The government's argument ignores the fact that there is absolutely no suggestion in the record that Hughey either possessed or had access to the additional codes that would have been required to complete a wire transfer with the account numbers. More importantly, the government's interpretation also ignores the plain text of the parenthetical exclusion, which is directly applicable to Hughey's conduct. The statute excludes "transfer[s] originated solely by paper instrument," without regard to whether the transfer involved some component of an access device or some device which, but for the parenthetical exclusion, might otherwise have the potential be an access device.

Hughey used the account numbers to originate a transfer solely by paper instrument. Hughey did not use the subject account numbers independently to gain account access. Indeed, Hughey merely presented bad checks with those numbers to unsuspecting third parties in order to defraud those organizations into giving him money back in exchange for the instruments.[7] We are not persuaded that Hughey's mere possession of the numbers, at least

_____

[7] Hughey was also prosecuted and convicted in separate counts for passing the counterfeit Central Linen checks to HEB in violation of 18 U.S.C. § 513. With respect to those checks, there appears to be no way to distinguish the conduct thus punished under § 513 from that punished under § 1029.

29

without additional evidence demonstrating the possibility of an additional use, is sufficient to overcome the express statutory provision excluding his conduct from the ambit of § 1029.[8]

The government also argues that Hughey's conduct went beyond merely the creation and presentation of bad checks. Specifically, the government points to evidence that Hughey ordered form checks bearing Central Linen's name from a printing company, and that at least some of the completed Central Linen checks were given to Tippins to cash while Hughey waited outside. The government argues that such conduct goes beyond merely passing bad checks and invades the province of "trafficking' in access devices.

Even assuming that Hughey's conduct can be characterized as "trafficking," Hughey was merely trafficking in counterfeit or forged checks. The government's approach, although clever, ignores the fact that the checks, and Hughey's conduct in relation to the checks, both fall outside the statutory definition of an

---

[8] The government offers *United States v. Sepulveda*, 115 F.3d 882, 889 (11th Cir. 1997) as a case adopting its "potential use" theory. That case has no application to the issue presented here. First, the defendants in *Sepulveda* were charged under § 1029(a)(3), which criminalizes mere possession of more than fifteen access devices and does not require actual use, knowing or otherwise. *Id*. at 884-85. Hughey was charged under § 1029(a)(2), which requires that the government prove an actual use. Second, even *Sepulveda* relies in part upon the defendant's actual, as opposed to potential, use. *See id.* at 889 (fact that defendants used some of the devices supported an inference that they had access to the technology required to use the remaining devices and that the devices were therefore capable of affording account access).

30

unauthorized access device.  The nature of Hughey's conduct with respect to the checks in this case does not change their essential nature.

Count 2 fails to allege a cognizable federal offense.  "If an indictment does not charge a cognizable federal offense, then a federal court lacks jurisdiction to try a defendant for violation of the offense." *United States v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1998) (citing *United States v. Armstrong*, 951 F.2d 626, 628 (5th Cir. 1992)), *cert. denied*, 118 S. Ct. 1688 (1998); *see also United States v. Dabbs*, 134 F.3d 1071 (11th Cir. 1998) (indictment must allege use of an "access device" within the meaning of § 1029 in order to confer federal jurisdiction); *Thor v. United States*, 554 F.2d 759, 762 (5th Cir. 1977) ("If the indictment upon which Thor was tried and convicted failed to allege a federal offense, the district court lacked the subject matter jurisdiction necessary to try Thor for the actions alleged in the indictment.").  Hughey's conviction on count 2 is reversed and the cause remanded for entry of a judgment excluding that count.[9]

---

[9]     We note in passing that count 1, which also charged a violation of § 1029 does not suffer from the same defect as count 2.  Count 1 charged conduct relating to (1) counterfeit checks presented to a retailer, and (2) a retail credit card account. Although the first factual allegation falls outside the scope of § 1029, the second allegation and Hughey's conduct in relation thereto fall well within the prohibition prescribed by § 1029. There is, therefore, no defect in count 1 of the indictment.

31

**HUGHEY'S CLAIM FOR RELIEF FROM RESTITUTION**

**I.**

The district court ordered Hughey to make restitution to a number of banks and businesses. Hughey's final argument is that the district court's order of restitution to two of those entities, TCB and HL&P, was in error.

We review the legality of the district court's order of restitution de novo. *United States v. Chaney*, 964 F.2d 437, 451 (5th Cir. 1992). Once we have determined that an award of restitution is permitted by the appropriate law, we review the propriety of a particular award for an abuse of discretion. *Id*.

Hughey maintains that the restitution order goes beyond what was proven at trial and considers amounts that are not tied to the offense made the basis of the restitution order. The judgment entered by the district court awarded $40,675.10 in restitution to TCB and $22,260 in restitution to HL&P. Those amounts were drawn from the lengthy Presentence Report and supporting documentation. Both the PSR and the judgment of conviction report that the order of restitution in favor of TCB and HL&P was justified by Hughey's conviction on count 2, which has been reversed herein, and Hughey's conviction on count 11, which alleged a comprehensive scheme to defraud TCB.

32

Obviously, the restitution order cannot be supported by Hughey's conviction on count 2. Aside from the fact that we have reversed the conviction, the substantial losses made the basis of the restitution order exceed by a considerable margin, and thus fall outside the scope of the conduct made the basis of that conviction at trial. *See Hughey v. United States*, 110 S. Ct. 1979, 1982-84, 109 L.Ed.2d. 408 (1990).[10] The restitution order may potentially be supported, however, on the basis of Hughey's count 11 conviction for bank fraud.

## II.

The Victim and Witness Protection Act, 18 U.S.C. § 3663, authorizes a district court to order restitution to any victim of the particular offense made the basis of the restitution order. 18 U.S.C. § 3663 (a)(1)(A). A "victim" is defined as someone who was both "directly and proximately harmed as a result of an offense for which restitution may be ordered." *Id*. at § 3663(a)(2). In 1990, the Supreme Court held that an award of restitution may not include losses that do not directly result from the offense made the basis of the conviction supporting the restitution order. *Hughey*, 110 S. Ct. at 1982-84 (reversing restitution order that included losses incurred with respect to counts dismissed as part

---

[10] *Hughey* involved this defendant's prior federal conviction for use of an unauthorized credit card.

33

of a plea agreement and holding that restitution order may not exceed the scope of the offense of conviction). After *Hughey*, some courts held that an order of restitution must be limited to the loss attributable to the specific conduct supporting the offense of conviction, even when the offense of conviction involved a conspiracy or scheme. *E.g.*, *United States v. Sharp*, 941 F.2d 811, 815 (9th Cir. 1991). Congress responded by amending that portion of the Victim and Witness Protection Act that defines who may receive restitution. The statute now provides that when the subject offense involves a scheme, conspiracy, or pattern of criminal activity, restitution may be awarded to any person who is directly harmed by the defendant's course of criminal conduct. *Id*. That part of *Hughey* which restricted the award of restitution to the limits of the offense, however, still stands. *See, e.g.*, *United States v. Upton*, 91 F.3d 677, 686 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1818 (1997); *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995); *United States v. Stouffer*, 986 F.2d 916, 928-29 (5th Cir. 1993) (restitution may be ordered for victims who are not named in the indictment provided that the scheme is precisely defined in the indictment).

Count 11 alleged a comprehensive scheme of bank fraud in violation of 18 U.S.C. § 1334. TCB is named as the victim in count 11 of the indictment, and HL&P was directly harmed by the specific fraudulent activities made the basis of Hughey's conviction on that

34

count.  Therefore, TCB and HL&P are the types of organizations that may receive restitution for Hughey's count 11 bank fraud offense. *See* 18 U.S.C. § 3663(a)(2).

The restitution award must still be limited, however, to those losses within the scope of the offense alleged in count 11.  To determine whether the order is appropriately limited, we will examine both the amount of the claimed losses and the scope of the offense conduct.  The record contains detailed documentary evidence supporting TCB's and HL&P's claimed loss of $62,933.10.[11]  The record also contains evidence that HL&P paid $22,260 of the claimed loss, while TCB paid $40,675.10 of the claimed loss.  Although Hughey lodged general objections that the PSR overestimated the loss, Hughey did not file evidence capable of rebutting the detailed evidence presented in support of the PSR calculations. *See **United States v. Cisneros***, 112 F.3d 1272, 1280 (5th Cir. 1997); *see also **United States v. St. Gelais***, 952 F.2d 90, 97 (5th Cir. 1992) (affirming the district court's reliance on PSR for statement of loss calculation).  We conclude that the government met its burden of establishing that TCB and HL&P suffered the claimed

---

[11]   TCB and HL&P claimed a joint loss of $78,543.89.  Of that amount, $15,610.79 was recovered from other accounts.  The net loss claimed was therefore $62,933.10.

losses by a preponderance of the evidence. 18 U.S.C. § 3664(e); *United States v. Razo-Leora*, 961 F.2d 1140, 1146 (5th Cir. 1992).

We turn now to the scope of the offense conduct. The fraudulent scheme made the basis of Hughey's conviction on count 11 began on or about April 26, 1993 and continued until on or about September 24, 1993. Notwithstanding that temporal limitation in the indictment, the documentary evidence supporting the restitution order includes a significant number of losses that occurred before April 26, 1993. Of the claimed loss of $62,933.79, only $56,520 occurred within the timeframe defined for the subject offense in the indictment. Under *Hughey*, the district court lacked authority to award restitution in excess of those amounts attributable to the conduct made the basis of Hughey's conviction. *See Pepper*, 51 F.3d at 473; *Stouffer*, 986 F.2d at 929 (both holding that restitution for all losses caused by a criminal scheme satisfied *Hughey*'s requirement that restitution be limited to the offense of conviction because the indictment specifically defined both the duration of the scheme and the fraudulent conduct). Those losses in excess of $56,520 fall outside the offense as defined in the indictment, and the trial record does not otherwise tie those losses to Hughey's fraudulent scheme. We therefore conclude that the record does not support an award of restitution in favor of TCB and HL&P in excess of $56,520 with respect to count 11. Of that

36

amount, the record reflects that HL&P paid $22,260.

The restitution order is affirmed to the extent that $56,520 was awarded to TCB and HL&P for losses directly resulting from the conduct made the basis of Hughey's conviction on count 11. The restitution order is reversed to the extent that it awarded losses in excess of that amount to these parties. The case will be remanded for entry of a modified judgment in accordance with this opinion.

## CONCLUSION

Hughey's convictions on count 1 and counts 3 through 11 are AFFIRMED. Hughey's conviction on count 2 is REVERSED. The district court's order of restitution is AFFIRMED in part, REVERSED in part. The cause is REMANDED for entry of a modified judgment reflecting the reversal of count 2 and limiting the amount awarded to TCB and HL&P to those amounts that are within the scope of Hughey's conviction on count 11.

37